[No. 25541–0–I.· Division One.   April 29, 1991.]

SNOHOMISH COUNTY IMPROVEMENT ALLIANCE, *Appellant*, v.
SNOHOMISH COUNTY, ET AL, *Respondents*.

*J. Robert Leach* and *Nielson, Nielson & Leach,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Gordon Sivley, Deputy,* for respondents.

SCHOLFIELD, J.—Snohomish County Improvement Alliance (SCIA) appeals the trial court's dismissal on summary judgment of its declaratory judgment action challenging a decision of the Snohomish County Council regarding a rezone application. We affirm.

### FACTS

Phoenix Development, Inc., Tom Parmenter, and Donald Littrell (Phoenix) are the owners of a parcel of land in Snohomish County. Phoenix sought a rezone of the property from Residential 8,400 and Suburban Agriculture 1 Acre to Planned Residential Development 8,400 and Planned Residential Development 20,000. It also sought a Shoreline Substantial Development Permit and preliminary plat approval.

The hearing examiner determined that the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C.030-(2)(c), required the preparation of an environmental impact statement (EIS), denied the rezone application, and determined that the plat application and the application for a shoreline development permit required modification.

Phoenix appealed the hearing examiner's decision to the Snohomish County Council. Public hearings were conducted on July 31 and September 20, 1989. At the close of the public testimony at the September 20 hearing, the Council passed a motion to remand the matter back to the hearing examiner. The oral motion was made as follows:

> BARTHOLOMEW: Well, maybe I can get it started. I think there's certainly a quantity of issues that have been raised that justify a remand back to the Hearing Examiner. I think the issue of compatibility, the existing zoning versus previous zoning, wetland mitigation, the potential of a DNS, an expanded DNS checklist . . . I think, I think all of those would be reason to remand it back to the Hearing Examiner and I certainly would welcome some comments. I'd make that in a motion if you so desire.

The motion was seconded. Questions were asked concerning exactly what the impact of the motion would be, and the Council's attorney, Gordon Sivley, was asked for clarification:

> CORCORAN: My point is that to remand it based on, the appeal is based on . . . they're appealing the Determination of Significance, isn't that right?
> 
> . . . .
> So we have to say to remand it back we have to articulate that that is incorrect to require that Determination of Significance.
> SIVLEY: The Council motion would have to be basically as follows. If the Council finds that the Determination of Significance was in error . . .
> 
> . . . .
> . . . that there are not probable significant adverse impacts for the following reasons, and then detail what those reasons are.
> 
> . . . .
> MCLAUGHLIN: Is there no other way to remand it?
> SIVLEY: Well, if you're going to ask for a different environmental analysis, you need to do that. You need to either affirm or

reject the environmental determination that's been made. If you are to reverse it, you have to enunciate your reasons why it was determined to be in error and how it's to be redone.

. . . .

BRUBAKER: Well, for what it's worth, I agree with the maker of the motion. I think that the reconcilable differences, or that they're not nonreconcilable. That the comp plan is a guide and zoning's a brush. I think the density issue's been already addressed in the development surrounding the proposal. I feel an EIS is out of the ordinary, and if you look at the, our own analysis says that the traffic mitigation has been addressed. . . .

. . . .

BRUBAKER: Well, I have a motion and a second before this body. Is there any further comment or questions?

BARTHOLOMEW: Call for the question.

The vote on the motion was then recorded.

A written decision on the Phoenix appeal was issued, reversing the decision of the hearing examiner, adopting findings 1 through 40 and conclusions 1, 2, 4, 5, 23, 24, and 25 of the hearing examiner, and adding findings 41, 42, and 43 and conclusions 26 through 33. The written decision was signed by Brubaker as chairman and attested by the assistant clerk of the Council. Official notice of the Council's decision was mailed to parties of record sometime between September 20 and 25.

Debbie Abrahamsen, president of SCIA, sent a letter to the Council dated October 2, 1989, contending that the decision was improper. The letter specified three problems with the decision:

1. It conflicts with all previous decisions on the same issue;
2. Two Councilmembers accepted large campaign contributions from sources who stand to profit from the Council action;[1] and
3. Section 2.50.030 of the Snohomish County Ethics Code has been violated.

Chairman Brubaker responded to Abrahamsen's letter, denying her request for vacation of the decision on the

---

[1]Bartholomew accepted $1,000 from Sundquist Homes and $150 from Group Four, Inc. Britton accepted $500 in contributions from Larry Sundquist. Larry Sundquist is vice–president of Phoenix. Group Four, Inc., is the plat designer for Willow Glen Division 3, the Phoenix development at issue here.

basis that there was no provision for reconsideration except for a clerical error. However, the letter reminded Abrahamsen of her right to participate as a party of record in further proceedings before the hearing examiner or to appeal the decision to superior court.

On November 1, 1989, SCIA filed a petition for constitutional and statutory writs of review and a complaint for declaratory and injunctive relief in superior court. The lawsuit was dismissed on summary judgment in January 1990. In its order granting summary judgment, the trial court concluded that the petitions for the writs of review and the challenge to the SEPA determinations were barred by the 15–day statute of limitations; that SCIA had standing to commence the declaratory judgment action; that the Council did not violate RCW 42.30, the Open Public Meetings Act of 1971; that the Council did not violate the appearance of fairness doctrine when two members participated in the decision after receiving campaign contributions from interested parties; and, in addition, that this was not a conflict of interest as defined in Snohomish County Code (SCC) 2.02.070; and finally, that the lawsuit was not frivolous, so no attorney's fees would be awarded.

## STATUTES OF LIMITATION

The Snohomish County Code provides for a limitation of 15 days within which to file an appeal by writ of certiorari from a County Council decision on an appeal from a decision of a hearing examiner. SCC 2.02.190. The complaint in this case was not filed until November 1, 1989, well beyond the 15 days. Appellant's brief makes the bare assertion that the trial court erred in holding the applications for writs of review were barred by the 15–day limitation. However, appellant cites no authority and makes no argument on the issue. Contentions not supported by argument or authority need not be considered on appeal. RAP 10.3(a)(5); *Bremerton v. Shreeve,* 55 Wn. App. 334, 338, 777 P.2d 568 (1989).

SCIA argues that the County Council decision was void and therefore could be attacked at any time. SCIA's complaint attacking the validity of the County Council decision was dismissed by the trial court on its substantive merits. The dismissal was not based on a statute of limitation. Accordingly, there is no statute of limitation issue before the court on this appeal.

### OPEN PUBLIC MEETINGS ACT OF 1971 (OPMA)

Pertinent provisions of OPMA read in pertinent part:

> (1) No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this subsection shall be null and void.

RCW 42.30.060(1). The chapter defines the term "action" as follows:

> (3) "Action" means the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions. "Final action" means a collective positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance.

RCW 42.30.020(3). In addition, the Snohomish County Code also forbids private meetings of the Council:

> All meetings of the council shall be open to the public, and all persons shall be permitted to attend such meetings, except that this section shall not apply to executive sessions as authorized by the laws of the state of Washington. The council shall not adopt any ordinance, resolution, rule, regulation, order or directive except at meetings open to the public and held according to the provisions of this chapter.

SCC 2.48.070.

SCIA contends the decision of the County Council reversing the ruling of the hearing examiner is null and void because in rendering that decision, OPMA was violated. SCIA's theory is that the written decision filed

between September 20 and September 25 contains findings and conclusions which were not decided at the meeting of September 20, and contain substantive matters not included in Bartholomew's motion.

■ One of the purposes of OPMA is to give the public ready access to firsthand knowledge of the deliberations and decisions of public agencies where the executive session exception does not apply.

The record in this case discloses that the Phoenix application was discussed in public hearings on July 31 and September 20, 1989. Bartholomew's motion was made after the close of public testimony and makes specific, although admittedly cryptic, mention of (1) compatibility,[2] (2) wetland mitigation, and (3) the potential of a determination of nonsignificance. Chairman Brubaker, immediately before the vote was taken, summarized his views, specifically mentioning (1) reconcilable differences,[3] (2) the density of population issue, (3) the issue of an EIS, and (4) traffic mitigation.

■ It is implicit from Bartholomew's motion and Brubaker's comments that the mentioned issues had been the subject of considerable prior discussion and/or testimony. Furthermore, it is clear from the comments of Gordon Sivley that the councilmembers knew they were reversing the hearing examiner's conclusion that SEPA required the preparation of an EIS.

It must be kept in mind that the Council adopted the hearing examiner's findings 1 through 40 and added to its written decision findings 41, 42, and 43. Finding 41 related to the compatibility of actual development densities with

---

[2]The record makes it highly probable Bartholomew was speaking of the compatibility between the proposed zoning and existing development of nearby properties.

[3]Here again, it is highly probable this reference is to the difference between the proposed zoning and the existing comprehensive plan.

the proposed zoning. Finding 42 related to the compatibility between the proposed zoning and the existing comprehensive plan which was adopted in 1973. Finding 43 referred to wetland mitigation by keeping disturbance to the land "outside the 100 foot stream corridor to the maximum extent possible."

It is thus apparent that the additional findings made in the Council's written decision all involve subjects which were discussed in the hearings and were mentioned in the motion or Brubaker's summary of the issues made immediately prior to the vote on the motion.

The conclusions made by the Council also relate to the same issues of reconciling the requested zoning to the comprehensive plan: comparing the density involved in the requested zoning with the existing development of surrounding areas and protecting existing wetlands.

As SCIA argues, it is true that the findings and conclusions and the Council's written decision are much more expansive and detailed than the councilmembers' discussions set forth in the limited transcript provided for us in this appeal.

The Snohomish County Code provides in part as follows:

> (5) At the conclusion of the public hearing, the council shall enter its decision which shall set forth the findings and conclusions of the council in support of its decision. The council may adopt any or all of the findings or conclusions of the examiner which support the council's decision. The council may affirm the decision of the examiner, reverse the decision of the examiner either wholly or in part, or may remand the matter to the examiner for further proceedings in accordance with the council's findings and conclusions.
>
> (6) The council's decision shall be reduced to writing and entered into the record of the proceedings within fifteen days of the conclusion of the hearing. Copies of the decision shall be mailed to all parties of record.

SCC 2.02.180(5), (6).

The Council complied with the requirements of SCC 2.02.180 in entering a written decision which resolved the issues discussed at the hearings. The subjects discussed in

the hearings and those covered in the findings and conclusions of the ultimate decision were the same.

It is to be expected that the findings and conclusions which state in detail the basis and reasons for the Council's ultimate decision will be more expansive and detailed than the wording of the motion ultimately adopted. The important aspect is that the decision be consistent with the issues discussed in open hearing and the oral decision made at that time. That occurred here.

In *Martel v. Vancouver,* 35 Wn. App. 250, 666 P.2d 916 (1983), an action challenging a zoning variance granted to landowners, the Board of Adjustment filed its written findings and conclusions several weeks after the hearing in which the variance was granted. The appellants contended that the written findings included factual determinations that were not articulated by the Board at the conclusion of its deliberations at the hearing. *Martel,* at 258.

The *Martel* court disagreed, citing *North St. Ass'n v. Olympia,* 96 Wn.2d 359, 635 P.2d 721 (1981). The *Martel* court stated:

> Written findings and conclusions entered by a public body adjudicating land use issues may serve to elucidate the scope of the body's immediate oral decision. . . . The findings accurately reflect the proceedings and the Board's deliberations. We find no error in the procedure followed here.

(Citation omitted.) *Martel,* at 258–59. The written decision of the Snohomish County Council accurately reflects the proceedings and deliberations involved in the Phoenix application. We agree with the trial court that there was no violation of OPMA.

### APPEARANCE OF FAIRNESS

SCIA contends that the campaign contributions received by councilmembers Bartholomew and Britton from interested persons during the pendency of Phoenix's appeal to the County Council constituted a prehearing contact prohibited by SCC 2.02.070 and also violated the appearance of fairness doctrine. Both Britton and Bartholomew voted in favor of the motion.

█ When hearing an appeal of a rezone application, the county council acts in a quasi–judicial capacity. RCW 42.36.010; *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972); *Barrie v. Kitsap Cy.,* 84 Wn.2d 579, 586, 527 P.2d 1377 (1974). The appearance of fairness doctrine applies to quasi–judicial proceedings. RCW 42.36.010; *Fleming v. Tacoma, supra.*

RCW 42.36.060 prohibits ex parte communication in quasi–judicial proceedings and provides as follows:

> During the pendency of any quasi–judicial proceeding, no member of a decision–making body may engage in ex parte communications with opponents or proponents with respect to the proposal which is the subject of the proceeding unless that person:
> (1) Places on the record the substance of any written or oral ex parte communications concerning the decision of action; and
> (2) Provides that a public announcement of the content of the communication and of the parties' rights to rebut the substance of the communication shall be made at each hearing where action is considered or taken on the subject to which the communication related. This prohibition does not preclude a member of a decision–making body from seeking in a public hearing specific information or data from such parties relative to the decision if both the request and the results are a part of the record. Nor does such prohibition preclude correspondence between a citizen and his or her elected official if any such correspondence is made a part of the record when it pertains to the subject matter of a quasi–judicial proceeding.

RCW 42.36.050 speaks to the application of the doctrine to campaign contributions:

> A candidate for public office who complies with all provisions of applicable public disclosure and ethics laws shall not be limited from accepting campaign contributions to finance the . campaign, including outstanding debts; nor shall it be a violation of the appearance of fairness doctrine to accept such campaign contributions.

RCW 42.36.050.

The Snohomish County Code addresses the question of the appearance of fairness doctrine in SCC 2.02.070:

> No examiner shall conduct or participate in any hearing, decision or recommendation in which the examiner has a direct or indirect substantial financial or familial interest or concerning which the examiner has had substantial prehearing contacts

with proponents or opponents. Nor, on appeal from an examiner decision, shall any member of the council who has such an interest or has had such contacts participate in consideration thereof.

The trial court resolved these issues against SCIA, stating in its order as follows:

It did not constitute a violation of the Appearance of Fairness Doctrine when two Councilmembers participated in this case after contemporaneously receiving campaign contributions from interested parties. RCW 42.36.050. Moreover, such participation by said Councilmembers was not a conflict of interest as defined in Section 2.02.070 of the Snohomish County Code. The mere receipt of campaign contributions by a councilmember does not constitute a "direct or indirect substantial financial or familial interest," and does not constitute "substantial pre–hearing contacts with proponents or opponents."

There is no contention here that the campaign contributions were not duly reported as required by the public disclosure act, RCW 42.17. Phoenix so asserts in its brief, and SCIA does not contend otherwise.

RCW 42.36.060 prohibits ex parte communications with a member of the decision–making body. However, in this record there is no evidence of a *communication* with Bartholomew or Britton. While the term "communication" is not defined in the statute, in the context in which the word "communication" is used here, its commonly understood definition involving giving or exchanging ideas or information should be applied. *Webster's Third New International Dictionary* 460 (3d ed. 1969). Where we have a statute permitting campaign contributions if fully disclosed, it would run counter to legislative intent to hold that what is permitted in one statute can be said to violate another statute.

We agree with the trial court that the appearance of fairness doctrine was not violated here and that there was no ex parte communication between the councilmembers and the members of Phoenix. We also concur in the view of the trial court that campaign contributions made here did not create a conflict of interest in the recipient.

CROSS APPEAL

In its cross appeal, respondent Phoenix challenges the trial court finding that SCIA has standing to bring this action. Phoenix also contends that the trial court erred in not finding appellant's complaint was frivolous and awarding respondents reasonable attorney's fees.

Because of our disposition of the issues raised in this appeal, it is not necessary to address the question of whether SCIA had standing.

■ We agree with the trial court that appellant's complaint was not frivolous. The complaint raised debatable issues, both in respect to OPMA and the campaign contributions. *Streater v. White,* 26 Wn. App. 430, 434–35, 613 P.2d 187, *review denied,* 94 Wn.2d 1014 (1980).

Judgment affirmed.

GROSSE, C.J., concurs.

FORREST, J. (dissenting)—The majority holds that a written decision, adopted outside of the public forum by a single member of the Snohomish County Council and containing significantly more detailed and expansive findings of fact and conclusions of law than the formal oral motion, satisfies the open meeting requirement. I dissent.

The Open Public Meetings Act of 1971 (OPMA) establishes that no governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order or directive, except in a meeting open to the public.[4] In contrast, SCC 2.02.180(6) permits council decisions on appeals from the county hearing examiner to be reduced to writing and entered into the record within 15 days after the conclusion of the council hearing.

The decisions that may be reduced to writing can vary significantly. A council decision to affirm the hearing examiner may be simply stated in an oral decision with no need for additional findings. The council may also, as this case

---

[4]In accordance with this directive, Snohomish County Code 2.48.070 demands all county council resolutions be adopted at meetings open to the public.

demonstrates, reverse the hearing examiner, reject his find-ings and conclusions, and adopt independent findings and conclusions. While SCC 2.02.180(6) apparently permits the full spectrum of these decisions to be reduced to writing following a public hearing, the SCC must not be read to allow actions that frustrate the purpose of the OPMA.

Resolution of the dispute in this case requires this court to harmonize the OPMA and the SCC. If there is a conflict, the state OPMA must control. It is well established that the OPMA is remedial and should be liberally construed.[5] This court must evaluate the extent to which the subse-quent written findings and conclusions vary from the deci-sion made in the open forum. The vast discrepancy between the oral motion, appendix A, and the subsequently adopted written findings and conclusions, appendix B, is readily apparent and should not be tolerated.

The only precedent supporting the majority decision is *Martel v. Vancouver*.[6] While *Martel* allowed a written motion that varied from the oral, as long as it was an accu-rate reflection of the oral motion, the decision offers a rule with little guidance for its application. The factual record in *Martel* does not indicate to what degree the written and oral decisions varied. It is therefore impossible to determine what was considered an accurate reflection of the oral decision.[7] While the majority's interpretation of the oral

---

[5]*Mead Sch. Dist. 354 v. Mead Educ. Ass'n*, 85 Wn.2d 140, 145, 530 P.2d 302 (1975); *Port Townsend Pub'g Co. v. Brown*, 18 Wn. App. 80, 567 P.2d 664 (1977).

[6]35 Wn. App. 250, 666 P.2d 916 (1983).

[7]It should also be noted that while the *Martel* court cites *North St. Ass'n v. Olympia*, 96 Wn.2d 359, 369–70, 635 P.2d 721 (1981) as precedent, this issue was not discussed in *North Street*. There the court stated that where an oral decision was made, but was subject to additional conditions, it would be unfair to require a writ of appeal before the full scope of the decision was apparent. In other words, the decision was not final until all the conditions were known. Apparently the *Martel* court read this as approving a rule that written findings may vary from oral decisions. In fact, the case could equally support a converse argument that a nonspecific oral decision should not be considered final if it is substantially altered by a formal written decision.

motion here is plausible, it is by no means the only possible reading of the record. The oral motion would equally support different findings and conclusions. This does not meet the *Martel* test.

Close examination of the record does not support the majority's conclusion that the written findings merely elucidate the scope of the oral decision or accurately reflect that decision. To reach this conclusion the majority is forced to speculate what certain councilmembers were referring to.[8] The discussion following the motion does not clearly indicate that a majority of the council voted in favor of the findings as written. For instance, members were confused whether this was a reversal, a remand, or a combination of the two. In the opening motion it appears Councilperson Bartholomew recognized a number of issues that needed further review by the hearing examiner. Councilman McLaughlin, in response to apparent confusion about reversing the hearing examiner, stated,

> Well, could I add as the person that made the second, I would have to say that at this time I can't say that there was no reason to, I mean that the Hearing Examiner was in error. I thought we were continuing a process that would allow possibly it to happen without having to go through a full blown EIS on every other issue if this were the only one.

Although McLaughlin eventually voted for the motion, there is no indication that she changed her opinion in the few minutes between making the statement and voting.

Even absent OPMA requirements, it is fundamental that the final action of the council be supported by a majority of councilmembers. While the four councilmembers voting for the motion may have agreed to reverse the hearing examiner, it is far from clear that each and every finding was supported by a majority vote. Findings by a council in a

---

[8] See majority, at 70 & nn. 2, 3.

quasi–judicial proceeding are given great weight in subsequent judicial review.[9] Accordingly, it is essential that a majority agree to each finding. Even conceding that the general issues were mentioned in a "cryptic" fashion the specific conclusions were not apparent. Majority, at 70. It was possible to support a reversal without making each finding contained in the written motion. As the appellant noted, there is no indication that the four members voting in the majority had any idea what findings were finally placed in the written document. It is therefore impossible to conclude the findings and conclusions would have been adopted by a majority of the council.

Attempting to resolve this problem, the majority expands the rule from *Martel.* The majority holds that the written findings need only be "consistent" with the issues discussed in open hearing. Majority, at 72.[10] Such a rule requires this court to infer that issues mentioned during the motion "had been the subject of considerable prior discussion and/ or testimony." Majority, at 70. While this may be true, it does not follow that the prior testimony and discussion amounted to a finding or conclusion. Such judicial inferences are clearly not justified in this case, since the full record of the proceedings is not before the court. Even if the full record were available, we would be forced to speculate whether a particular "discussion" amounted to a majority of councilmembers approving a finding and conclusion on that issue or merely one member expressing an opinion. The majority holding renders all preliminary discussion potentially binding on the council and the parties.[11]

---

[9]*Victoria Towers Partnership v. Seattle,* 59 Wn. App. 592, 800 P.2d 380 (1990).

[10]There is considerable difference between a document that "reflects" an oral decision and one that is merely "consistent" with the issues contained in a discussion.

[11]The OPMA is intended to open council deliberations to the public, but this rule would likely chill discussion because the council will only make statements it is willing to be considered as findings of fact.

Appellants correctly note that the fact that a council-member may have made a comment during the public hearing is no indication that that comment was approved by a majority of the county council, nor does it assure that the maker did not subsequently change his or her mind. Of course there will be instances when the council expressly incorporates prior discussion into a motion so it will be evident it is intended to be part of the motion. In the absence of such specific inclusion, the court should not justify the later findings and conclusions by combing the record of the proceedings and speculating which statements were sufficiently discussed to be included in the final motion by implication.

The majority is justifiably concerned that it may be burdensome to expect a county council to express precise findings in its oral decision, especially when dealing with very complex and extensive hearings such as these. But it is in just such a case that it is appropriate for a majority of the council to formally adopt the written findings in a subsequent open meeting. Councilperson Bartholomew, reacting to the apparent complexity and confusion of the motion, suggested, "Well I think that to help us along here that I'd like to have a week's continuance to give staff time to help us phrase some language." Had this suggestion been followed, the written findings would have been prepared and presumably, but not necessarily, adopted. If adopted, the action would take place in a public forum as required by OPMA; there would be no doubt the findings were supported by a majority of the council, and no basis to appeal to the courts.

Comparing the record of the council's oral decision and the written findings and conclusions it is impossible to say the latter merely reflects the former. When the written findings and conclusions are significantly more detailed than the oral motion they are more than a reduction of the decision to writing, thus falling outside of the procedure allowed in SCC 2.02.180(6). Adopting the written findings is

an independent "action" by the council and must be conducted in an open forum.

The OPMA should control in this case and I would have reversed the trial court's decision.

APPENDIX A

The following is excerpted from the close of public testimony, September 20, 1989, Snohomish County Council Motion 89–288.

BARTHOLOMEW: Well, maybe I can get it started. I think there's certainly a quantity of issues that have been raised that justify a remand back to the Hearing Examiner. I think the issue of compatibility, the existing zoning versus previous zoning, wetland mitigation, the potential of a DNS, and expanded DNS checklist . . . I think, I think all of those would be reason to remand it back to the Hearing Examiner and I certainly would welcome some comments. I'd make that in a motion if you so desire.

BRUBAKER: I'll take it as a motion.

BARTHOLOMEW: Alright.

BRUBAKER: Is there a second?

MCLAUGHLIN: I'll second it.

BRUBAKER: OK. I have a motion and a second. Is there any discussion?

CORCORAN: Well, I'm gonna vote against it because I think that Planning has made the case that the Determination of Significance was in order, and there should be an EIS based on density. The density issue also comes into play on the rezone issue in conformance with the comprehensive plan, and the zoning, which is almost quadruple the number of units. And we can say, well it's less than next door or whatever is fine. All the past mistakes don't necessarily have to be . . . just go on and on. It's interesting that compatibility was not an issue in the recent North County plan that we . . .. In that case we actually took it from a half acre to 2.3 acres, I think, where there was a significant amount of half acre already available, and various other ones. And yet, in this part of the county, for some reason, some of my colleagues seem to feel that we can just . . . there's no end to what you can put down there into our road system. 228th is a very bad situation. An EIS would cover traffic. You travelled it when you were down there. You commented on how bad it is. But yet, it's denser and denser. I think that the Hearing Examiner was right. I think Planning was right, and I just cannot support it because in order for you to send this back, remand it, you must say now that there's no requirement of a determination, that there's no requirement for an EIS. I, you're gonna have to stretch things pretty good to make that case.

BRUBAKER: Any other comment?

MCLAUGHLIN: Well, yes, I would like to comment because I'm misunderstanding what an expanded checklist is then. If that is used, if this process is used, does this mean that they . . . if they found that it still needed an EIS, it would not have an EIS done?

BRITTON: Mr. Chairman, maybe we can get a determination as to just exactly what that motion does.

MCLAUGHLIN: Well, could I ask Gordon to answer that question?

BRUBAKER: Do I have to reopen the public testimony to do that? I don't . . . OK.

SIVLEY: Your question was . . .

MCLAUGHLIN: If we remanded it back for the expanded checklist and they found that it still was not a satisfactory method of looking to the mitigation, and I would include the wetland mitigations, I don't think you did . . .

BARTHOLOMEW: Yes I did.

MCLAUGHLIN: Oh did you? Excuse me. That there would not need to be an EIS done then? Because we remanded it back for an expanded checklist?

SIVLEY: That can't be determined. The checklist process precedes the decision as to whether to go to an EIS or not.

MCLAUGHLIN: That's what I thought.

SIVLEY: It's an information disclosure tool. It's really at the beginning of the SEPA process where the applicant is asked to describe in some detail what the project is and what its likely impacts will be. Expanded checklist would give an increased level of detail in certain areas that are of concern. And would then be used by again by the Planning Department as the lead agency to make a determination whether that information reveals significant impacts or not. And if significant impacts are revealed, then the EIS is required. Conversely if it's not.

CORCORAN: My point is that to remand it based on, the appeal is based on . . . they're appealing the Determination of Significance, isn't that right?

SIVLEY: Yes.

CORCORAN: So we have to say to remand it back we have to articulate that that is incorrect to require that Determination of Significance.

SIVLEY: The Council motion would have to be basically as follows. If the Council finds that the Determination of Significance was in error . . .

MCLAUGHLIN: Oh.

CORCORAN: Right.

SIVLEY: that there are not probable significant adverse impacts for the following reasons, and then detail what those reasons are.

CORCORAN: That's my point.

MCLAUGHLIN: Yeah.

CORCORAN: We have to make that case to remand it back. That's why I said it's unfortunate that they came too far down the trail with this particular proposal, but they thought they could get the approval here, here and here without going through it, and my point is that to return it we have to state now that that is in error.

BARTHOLOMEW: (Unintelligible)

MCLAUGHLIN: Is there no other way to remand it?

SIVLEY: Well, if you're going to ask for a different environmental analysis, you need to do that. You need to either affirm or reject the environmental determination that's been made. If you are to reverse it, you have to enunciate your reasons why it was determined to be in error and how it's to be redone.

BRUBAKER: Any further comment? Any part of the motion you wish to add or . . .

BARTHOLOMEW: Well I think that to help us along here that I'd like to have a week's continuance to give staff time to help us phrase some language.

MCLAUGHLIN: Well, could I add as the person that made the second, I would have to say that at this time I can't say that there was no reason to, I mean that the Hearing Examiner was in error. I thought we were continuing a process that would allow possibly it to happen without having to go through a full blown EIS on every other issue if this were the only one.

BRUBAKER: Well, for what it's worth, I agree with the maker of the motion. I think that the reconcilable differences, or that they're not non–reconcilable. That the comp plan is a guide and zoning's a brush. I think the density issue's been already addressed in the development surrounding the proposal. I feel an EIS is out of the ordinary, and if you look at the, our own analysis says that the traffic mitigation has been addressed. Public Works has bought off on the traffic mitigation saying it's acceptable and a portion of the traffic problem is already in an MRIP. So I don't know how much more specific you need to get. I think the impacts are no more adverse for this development than they are for the ones that already exist or are already planned.

CORCORAN: Which MRIP is that?

BRUBAKER: According to . . . here it says included within the 228th MRIP.

CORCORAN: Well, not really.

MCLAUGHLIN: It's not?

BRUBAKER: Well, according to our . . . intersections of 228th Street, Southeast 9th Avenue, Southeast 228th Street and SR 527 included within the 228th Street MRIP. Is that not correct?

BARTHOLOMEW: Over to 9th Avenue?

BRUBAKER: Yes.

BARTHOLOMEW: Yes, from memory, that's correct.

CORCORAN: That essentially . . . 228th and SR 527 MRIP is being funded by the development on the intersection. Now I don't know what contribution's being made from outside, but it won't be very much.

BRUBAKER: Well, I have a motion and a second before this body. Is there any further comment or questions?

BARTHOLOMEW: Call for the question.

BRUBAKER: The question's been called for. OK. All those in favor of the motion say aye.

BARTHOLOMEW: Aye.

BRITTON: Aye.

MCLAUGHLIN: Aye.

BRUBAKER: Chair also votes aye. All those opposed?

CORCORAN: Nay.

APPENDIX B

The following is the written motion adopted by the Snohomish County Council.

SNOHOMISH COUNTY COUNCIL
MOTION NO. 89-288
APPEAL FROM HEARING EXAMINER DECISION IN FILE
NO. ZA 8806245, PHOENIX DEVELOPMENT INC.

WHEREAS, Phoenix Development, Inc./Tom Parmenter applied to Snohomish County for concurrent rezone from Residential 8,400 and Suburban Agriculture 1 Acre to Planned Residential Development 8,400 and Planned Residential Development 20,000; preliminary plat approval; and a Shoreline Substantial Development permit for property located 350' west of 14th Ave. W. and about 850 feet north of 228th St. S.W., on the east side of Swamp Creek in the Swamp Creek Valley; and

WHEREAS, the Snohomish County Hearing Examiner held a public hearing on April 13, 1989 and issued his decision on April 28, 1989 to deny the rezone, return the preliminary plat and Shoreline Substantial Development Permit to the applicant for modification; and

WHEREAS, the applicant appealed this decision to the Snohomish County Council according to the provisions of SCC 2.02-.170, whereupon the Council held a public meeting on June 12, 1989 and a public hearing on July 31 and September 20, 1989 to consider the applicant's appeal; and

WHEREAS, after considering the appeal based upon the record, the Snohomish County Council did reverse the decision of the Hearing Examiner;

NOW, THEREFORE, ON MOTION:

Section 1. The Snohomish County Council makes the following findings of fact and conclusions:

1. The Council adopts the following findings of fact and conclusions of the Hearing Examiner in the case of Phoenix Development, Inc./Tom Parmenter, File No. ZA 8806245:

a. Findings 1 through 40; Conclusions 1,2,4,5,23,24,25.

2. The Council makes the following additional findings of fact and conclusions:

a. Finding 41. The zoning designations and actual development densities in the vicinity of the subject property are similar to and compatible with the proposed rezone and resulting density. The proposal would result in an average lot size of 12,200 sq. ft., which is compatible with surrounding area lot sizes of 8,400 sq. ft., 9,600 sq. ft. and 20,000 sq. ft.

b. Finding 42. The Alderwood Comprehensive Plan was adopted in 1973. The zoning on the subject property at that time was Residential 9,600. Such zoning would have allowed greater density than applicant is currently requesting. In 1975 approximately two–thirds of the subject area was rezoned to Suburban Agriculture – 1 Acre at the request of the owner of the plant nursery to the south of the subject property. At the time of the 1975 rezone the nursery owner also owned the subject property.

c. Finding 43. At the Council hearing, the applicant submitted a new wetland mitigation plan which was subsequently reviewed by the Planning Division and determined by Planning to require further modification in order to comply with Planning Division wetland procedures including keeping disturbance to the land outside the 100 foot stream corridor to the maximum extent possible. Specific recommendations for changes were not presented by Planning. The applicant's wetland consultant stated that he believed such a modified plan could be agreed upon between the applicant and Planning.

d. Conclusion 26. Under the circumstances of this case failure to follow the comprehensive plan does not mean that applicable land use goals and objectives cannot be met. Approval of the requested rezone, subject to appropriate SEPA–based conditions to mitigate identified adverse impacts, would lead to a consistent pattern of land use development in the subject area. The development of Willow Glen 4 across Swamp Creek from the subject site is similar to the one proposed; Willow Glen 4 was required to set back from Swamp Creek 50 feet. This development would be set back 100 feet from Swamp Creek. Area development to the north, south, east and west is at a density compatible with that proposed in this case. There is no evidence in the record which suggests that impacts to Swamp Creek

from this development would be significantly adverse and/or could not be mitigated.

e. Conclusion 27. The surrounding developed density pattern has occurred since the adoption of the Alderwood Plan and with the same zoning designations which are requested in this action, and as such constitutes a changed circumstance. The county has not adopted an areawide rezone to rezone this area to conform to the Alderwood Comprehensive Plan. As a result existing zoning designations have prevailed over the comprehensive plan language and a more dense pattern of development has occurred than if the area had been rezoned according to the comprehensive plan. In light of actual development according to existing zoning all around the subject site, there is little support for preservation of this parcel of land for Parks purposes, nor does the Parks Department have particular plans with respect to this land.

f. Conclusion 28. Based upon the council's site visit, the topography, location and wetland characteristics of the site reveal that Swamp Creek and its drainage way can be adequately protected by appropriate conditioning of the proposed development as well as by mitigation measures already offered by applicant.

g. Conclusion 29. The Plan is 15 years old and has not undergone amendments with respect to the subject area. Actual development patterns have proceeded in accordance with existing zoning and not with the plan designations. Although the plan's intent to protect the drainage way of Swamp Creek remains valid, surrounding development has been permitted to proceed, apparently in compliance with the county's drainage, wetland, SEPA and other environmental regulations. There is no unique situation shown in the record with respect to this property which suggests that the same responsible development cannot occur here.

h. Conclusion 30. The rezone, with appropriate SEPA conditions, can be consistent with the policies of the Alderwood Comprehensive Plan despite having a higher density than that proposed by the Plan.

i. Conclusion 31. There are changed circumstances justifying the rezone.

j. Conclusion 32. The requested rezone can be conditioned so as to promote the public welfare and protect the Swamp Creek drainage way.

k. Conclusion 33. The Hearing Examiner's determination that there is an irreconcilable conflict with the comprehensive plan is erroneous in light of the ability of the proposed development as conditioned, to protect the Swamp Creek corridor and drainage way from significant adverse impacts, and in light of changed conditions in the vicinity which have increased developed densities in all directions from the subject property.

Section 2. The Snohomish County Council enters its decision in the appeal of Phoenix Development, Inc./Tom Parmenter:

1. The Council reverses the decision of the Hearing Examiner to make a Determination of Significance (DS) and deny the rezone, and return the preliminary plat and Shoreline Substantial Development Permit to the applicant for modification.

2. The Council remands the case to the Planning Division for compliance with the provisions of Shoreline Management Substantial Development process, and for compliance with the provisions of the State Environmental Policy Act (SEPA) in accordance with the above–referenced findings and conclusions, and to make a recommendation to the Hearing Examiner on the rezone request in accordance with the above–referenced findings and conclusions.

Dated this _____20th_____ day of September, 1989.