[No. 15408-1-II. Division Two. April 19, 1994.]

MAYNARD NELSON, *Appellant*, v. MARY M. McGOLDRICK, *Respondent*.

ALEXANDER, J., dissents by separate opinion.

*Horton P.S. Smith* and *Felix, Zimmar & Smith,* for appellant.

*John Moore* and *Bonneville, Viert, Morton & McGoldrick,* for respondent.

HOUGHTON, J. — Maynard Nelson appeals an order of the Pierce County Superior Court granting summary judgment to Mary M. McGoldrick. He contends on appeal that the trial court erred in concluding that a contract he entered into with McGoldrick was unconscionable and, therefore, void and unenforceable. We reverse.

Maynard Nelson owns and manages a business known as Pacific Equities. Pacific Equities attempts to locate persons or their heirs whose whereabouts are unknown and who are owed money or property. One of the ways Nelson and his employee, Thomas Grauer, obtain business is to search through newspaper advertisements to find companies or persons who are attempting to discover the whereabouts of persons or their heirs who have money or property due them. Nelson and Grauer then locate the people or heirs and inform them that they will obtain the money or property for them in return for a fee for their services.

In one such effort, Grauer discovered a newspaper advertisement that indicated that Panorama City, Inc. (Panorama) was attempting to locate a person by the name of Richard Hodge. Nelson learned that Hodge, who reputedly

had been an attorney in Tacoma, was the owner of 500 shares of stock in Panorama that had an approximate value of $50,000. Panorama apparently needed to locate Hodge because it was involved in some corporate restructuring that involved an exchange of stock. Consequently, Nelson instructed Grauer to begin searching for Hodge.

Grauer traced Hodge to Tacoma and learned that he was deceased, but that his widow, Mary, was still living and resided in Tacoma. Further investigation revealed that Hodge's widow had remarried a man named Donald McGoldrick. Nelson contacted Mary McGoldrick by telephone and informed her that he had some "money or stocks due her". Nelson refused, however, to divulge any specifics about the nature or location of the Panorama stock. At Nelson's suggestion, McGoldrick agreed to meet with him.

On July 29, 1987, Nelson and McGoldrick met at McGoldrick's home in Tacoma. Apparently, McGoldrick's husband, a real estate broker, was also present at that meeting. Nelson told McGoldrick that he was aware of assets worth approximately $50,000 that were likely owed to her as Richard Hodge's widow and heir. Nelson again declined to reveal any additional information about the asset unless McGoldrick agreed to sign an agreement assigning one-half of the net value of the assets to him. Nelson later indicated in a deposition, in response to a question of what he would do if someone wanted to conduct their own investigation, that he was willing to "let them go do it". While Nelson's memory of the meeting with McGoldrick was hazy, he indicated that he generally tells persons in such situations that he will not make "a special trip" or a "personal visit" to see them again because his "time is too valuable".

McGoldrick's stepson David, a Tacoma attorney, arrived at McGoldrick's house sometime during McGoldrick's meeting with Nelson. Mary McGoldrick apparently sought his advice. Eventually she signed the agreement presented by Nelson. It stated:

FEE MEMORANDUM: To Maynard Nelson

In consideration of your successful efforts to notify me of unclaimed assets to which I (claimant) may be entitled, and your promise to direct my claim into proper channels, I hereby assign to you (finder) one-half of the net collection. It is understood: 1. Claimant will cooperate by executing documents needed to complete the claim; 2. Unless a collection is made there will be no charge to claimant whatsoever.

Following execution of the agreement, Nelson contacted Panorama and informed the company that he had located Hodge's widow. Nelson also told his attorney, Douglas Whitlock, to process McGoldrick's claim with Panorama. Whitlock then contacted Panorama to inform it that he was acting as the attorney for the "heirs of Richard R. Hodge, Deceased". That same day, an officer of Panorama sent forms to Whitlock, asking him to complete them so that McGoldrick could complete her claim. After receiving no response from Whitlock, Panorama mailed a second letter. This letter also elicited no response. Nelson claims that the reason for his and Whitlock's inaction was that McGoldrick had refused to sign a limited power of attorney relative to the Panorama shares of stock.

David McGoldrick then contacted Whitlock, who apparently informed him that Mary McGoldrick's property consisted of 500 shares of Panorama stock. David McGoldrick then processed the claim for Mary McGoldrick. Despite demands by Nelson, Mary McGoldrick has refused to pay Nelson any portion of the fee provided for in their agreement.

Nelson brought suit in Pierce County Superior Court seeking to recover the fee provided for in the agreement with McGoldrick. McGoldrick responded to Nelson's complaint, asserting that the contract was void and, thus, unenforceable. McGoldrick also filed a third party claim against Panorama, alleging that it failed to take reasonable efforts to locate her. McGoldrick's claim against Panorama was not resolved on summary judgment, and Panorama is not a party to this appeal.

McGoldrick moved for summary judgment, contending that the contract with Nelson was unconscionable, illegal, and violative of public policy and a Washington statute limiting the amount of finder's fees. In support of her motion, McGoldrick submitted depositions from Nelson, Dennis Dunham (a Panorama employee), and David McGoldrick. Nelson submitted his own declaration in opposition to this motion. The trial court granted McGoldrick's motion, concluding that the contract was unconscionable and, therefore, unenforceable and void.

# I

## UNCONSCIONABILITY

■ ■ Nelson contends that the trial court erred in concluding that the contract between him and McGoldrick was unconscionable and void. An unconscionable contract is one that no one in his or her senses, not under delusion, would make, and which no fair and honest person would accept. *Gill v. Waggoner*, 65 Wn. App. 272, 278, 828 P.2d 55 (1992); *Montgomery Ward & Co. v. Annuity Bd. of the Southern Baptist Convention*, 16 Wn. App. 439, 444, 556 P.2d 552 (1976). Whether or not a contract is unconscionable is a question of law for the court to decide. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990). In determining if a contract is unconscionable, a court must examine all facts and circumstances surrounding the transaction. *American Nursery*, 115 Wn.2d at 222.

■ Washington courts have recognized two types of unconscionable contracts, *i.e.*, those that are substantively unconscionable and those that are procedurally unconscionable. *Yakima Cy. Fire Protec. Dist. 12 v. Yakima*, 122 Wn.2d 371, 391, 858 P.2d 245 (1993). A contract is substantively unconscionable "where a clause or term in the contract is alleged to be one-sided or overly harsh". *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 259-60, 544 P.2d 20 (1975). In another case, a court described contracts that contain terms that are "[s]hocking to the conscience", "monstrously harsh",

and "exceedingly calloused" as substantively unconsciona-ble. *Montgomery Ward*, 16 Wn. App. at 444.

█ A contract is procedurally unconscionable where "im-propriety during the process of forming a contract" results in a party to the contract not having a meaningful choice as to whether to enter into the contract. *Schroeder*, 86 Wn.2d at 260. In *Schroeder*, the court set forth three factors that may be used to determine if a party was afforded a meaning-ful choice. They are: (1) the manner in which the contract was formed; (2) whether the parties had the opportunity to understand the contract terms; and (3) whether the terms were hidden in a maze of fine print. *Schroeder*, 86 Wn.2d at 260. Although the unconscionability issue in *Schroeder* arose in a Uniform Commercial Code (UCC) context, the proce-dural unconscionability factors were set out as part of a gen-eral review of the doctrine of unconscionability. *Yakima*, 122 Wn.2d at 391; *Jeffery v. Weintraub*, 32 Wn. App. 536, 542, 648 P.2d 914 (1982).

██ Nelson initially contends that under *Schroeder*, the issue of unconscionability is not susceptible to summary judgment. Although the court in *Schroeder* did say that "a court is not authorized to dispose of this issue under the rules governing summary judgment", 86 Wn.2d at 262, we agree with Division One that the statement is dicta. *Jeffery*, 32 Wn. App. at 542. In *Jeffery*, Division One noted that if the material facts are undisputed, general principles relating to summary judgment motions could be employed to determine if a contract was unconscionable. Furthermore, the court's rationale for requiring a hearing in *Schroeder* was that a UCC provision, RCW 62A.2-302, mandated a full hearing to present evidence as to the commercial setting and purpose of the contract. *Schroeder*, 86 Wn.2d at 262.

Division One elaborated that: "[w]e assume without deciding that a 'reasonable opportunity to present evidence' is required in a non-UCC case as well as one claiming unconscionability under the UCC. Other courts have held, as we do now, that a hearing on a motion for summary

judgment gives the parties the 'reasonable opportunity to present evidence' ". *Jeffery*, 32 Wn. App. 541 n.5.

Here, the contract at issue is not governed by the UCC because it is a contract for services, and Article 2 applies to "transactions in goods". RCW 62A.2-102. Furthermore, although Nelson assigned error to the trial court's failure to accord him a full hearing to allow him to present evidence of the commercial setting and purpose of the contract, he has cited no authority or argument supporting this contention, so we will not consider it. *Transamerica Ins. Group v. United Pac. Ins. Co.*, 92 Wn.2d 21, 29, 593 P.2d 156 (1979); RAP 10.3(a)(5). In any case, we agree with Division One that a hearing on a motion for summary judgment provides a reasonable opportunity to present evidence.

There are no material facts in dispute here, as McGoldrick conceded for purposes of summary judgment that all facts and assertions provided in Nelson's deposition were true. Therefore, the issue of unconscionability is amenable to resolution on summary judgment. CR 56(c).

A

Substantive Unconscionability

We first address whether the contract was substantively unconscionable. Under the principles enumerated above, we must look at the facts and circumstances surrounding the transaction in order to determine if the agreement or a term in the agreement is unconscionable. Although a 50 percent finder's fee might seem to some to be excessive, that fact is not, by itself, sufficient to warrant a conclusion that this agreement is substantively unconscionable. Indeed, we cannot say that no rational person would agree to pay the fee set forth in the agreement between the parties.

Significantly, McGoldrick had the option to pursue recovery of the assets on her own, yet she chose to agree to pay Nelson an amount of money for services that was equal to one-half of the assets. A fee of that amount might be deemed to be disproportionate to the service performed, if the service is viewed only in terms of the amount of labor involved. Nelson

did, however, uncover a valuable asset of which McGoldrick was previously unaware. This was a service that had great value to McGoldrick, and it was not irrational for her to agree to the terms proposed by Nelson in order to obtain possession of the asset. Taking into consideration the undisputed facts and circumstances surrounding the transaction, we conclude that the contract term here was not substantively unconscionable.

## B
### Procedural Unconscionability

McGoldrick asserts that the contract was procedurally unconscionable because Nelson presented a "take-it-or-leave-it" proposition to which she had no choice but to agree. In order to determine whether McGoldrick had meaningful choice, we apply the three aforementioned factors from *Schroeder*. As to the manner in which the contract was entered, Nelson informed McGoldrick that he had discovered some assets that belonged to her and asked her to sign the contract before he divulged more information. Nelson's approach did not appear to deprive McGoldrick of meaningful choice. The only conduct by Nelson that may have placed some pressure on McGoldrick was when Nelson allegedly stated that he would not make another trip to Tacoma to meet with McGoldrick. Even if he did say that, this was not significant pressure, and it was mitigated by the fact that McGoldrick was free to perform the search on her own.

The second factor under *Schroeder*, whether the person had the opportunity to understand the contract terms, also favors Nelson's position. McGoldrick discussed and signed the simple agreement in the presence of her stepson and her husband. Indeed, she concedes that she "sought the advice" of her stepson, who is an attorney. It appears also that she had ample opportunity to study the terms of the agreement before signing it. Finally, because the agreement was short and not at all complex, there were no hidden

terms in fine print. Considering all of the circumstances, we conclude that there was no procedural unconscionability.

## II

### ADDITIONAL GROUNDS FOR CONTRACT UNENFORCEABLE

McGoldrick raises several alternative reasons why enforcement of the contract should be defeated. Although the trial court did not rely on any of these reasons in granting summary judgment to McGoldrick, they were raised by her in the trial court at the motion for summary judgment. We may, therefore, consider these issues. RAP 9.12.

### A

### Illegality

■ McGoldrick contends that the contract is illegal, and, thus, void because it is violative of criminal statutes prohibiting extortion. If a contract is illegal or grows immediately out of and is connected to an illegal act, Washington courts will not enforce the contract and will leave the parties to the contract where they find them. *Golberg v. Sanglier*, 96 Wn.2d 874, 879, 639 P.2d 1347 (1982); *Dodd v. Gregory*, 34 Wn. App. 638, 642, 663 P.2d 161, *review denied*, 100 Wn.2d 1007 (1983). As a general rule, a contract that is contrary to the terms or policy of an express legislative enactment is illegal. *State v. Pelkey*, 58 Wn. App. 610, 615, 794 P.2d 1286 (1990).

RCW 9A.56.130(1) defines second degree extortion as "commit[ting] extortion by means of a threat as defined in RCW 9A.04.110(25)(d) through (j)." "Extortion" is defined in RCW 9A.56.110 as "knowingly to obtain or attempt to obtain by threat property or services of the owner . . .." An "owner" is a person who "has possession of or any other interest in the property or services involved". RCW 9A.56.010(8). According to RCW 9A.04.110(25)(g) "threat" means "to communicate, directly or indirectly the intent . . . [t]o testify or provide information or withhold testimony or information with respect to another's legal claim or defense . . .."

■ McGoldrick contends that Nelson's conduct amounted to extortion because he obtained her agreement to pay his fee by threatening to not provide her with information regarding her claim to the Panorama stock. We disagree. There is a significant difference between the act of negotiating a contract and extortion. In contract negotiations, neither party is obligated to provide the other party with any information. Indeed, neither party is bound to contract at all. Nelson was not obligated to provide any information to McGoldrick, and McGoldrick was not obligated to enter into the contract. That being the case, Nelson's conduct did not constitute a threat as that term is defined in RCW 9A.04.110(25)(g).

■ Our interpretation of RCW 9A.04.110(25)(g) is buttressed by RCW 63.29.350, which provides in part as follows:

> **Penalty for excessive fee for locating abandoned property.** It is unlawful for any person to seek or receive from any person or contract with any person for any fee or compensation for locating or purporting to locate any property which he knows has been reported or paid or delivered to the department of revenue pursuant to this chapter in excess of five percent of the value thereof returned to such owner.

It is apparent that this statute contemplates that persons may, as Nelson did, negotiate a fee for advising a property owner of the existence of property that was previously located by the person obtaining the fee. We presume that the Legislature would not declare conduct criminal in one statute and expressly permit that same conduct in another statute. *Snohomish Cy. Imp. Alliance v. Snohomish Cy.*, 61 Wn. App. 64, 74, 808 P.2d 781 (1991) ("it would run counter to legislative intent to hold that what is permitted in one statute can be said to violate another statute"). In light of RCW 63.29.350, we are loath to invalidate all contracts where a so-called "heir hunter" or "heir finder" discovers information about property that belongs to another and attempts to collect a percentage fee as consideration for divulging information about that property to the property owner.

McGoldrick asserts, additionally, that the contract was illegal because it violates RCW 63.29.350 by providing for a fee of 50 percent of the value of the asset returned to the owner. That argument fails because this statute, by its terms, does not apply here. The property in question was not reported, paid or delivered to the Department of Revenue.

B

Public Policy

McGoldrick contends that the contract should be declared void as against the public policy of this state. She again cites RCW 63.29.350 as establishing a public policy against fees of this magnitude for locating property. McGoldrick also relies on *Mutual of Enumclaw Ins. Co. v. Wiscomb*, 95 Wn.2d 373, 622 P.2d 1234 (1980), where our Supreme Court struck down a family members exclusion clause in an insurance policy as violating the public policy of the Financial Responsibility Act (RCW 46.29). However, the statute cited by McGoldrick does not appear to establish a public policy against high percentage finders fees in all cases, but rather only for those cases involving property that is reported, paid or delivered to the Department of Revenue.

McGoldrick also cites several cases where contracts were struck down as violating public policy even in the absence of a specific legislative enactment. She cites *Goodier v. Hamilton*, 172 Wash. 60, 63, 19 P.2d 392 (1933), where our Supreme Court held that a contract can violate public policy if it has a "tendency to evil". She further cites *Wright v. Corbin*, 190 Wash. 260, 67 P.2d 868 (1937), where the court found a contract to pay an expert witness a greater fee if a lawsuit resulted in a successful outcome violated public policy because it was against "sound morals". Finally, McGoldrick relies on *Marshall v. Higginson*, 62 Wn. App. 212, 813 P.2d 1275 (1991), *review granted*, 118 Wn.2d 1008, *review dismissed*, 119 Wn.2d 1013 (1992), where Division One found an attorney's contract to prospectively limit malpractice liability violated public policy because it appeared to be contingent on the attorney's willingness to testify.

Division One noted that a contract violates public policy when it has a tendency to evil, is against the public good, or is injurious to the public. *Marshall*, 62 Wn. App. at 216.

The cited cases do not support McGoldrick's contention that the contract here violates public policy. Although the terms of Nelson's agreement with McGoldrick might seem harsh, the agreement does not appear to have the same kind of corrupting tendencies described above. The agreement does not impair the legal system or injure the public good.

## III

### OTHER JURISDICTION

Because this is a case of first impression in Washington, we observe how one other jurisdiction approached this issue. The Wisconsin Court of Appeals upheld the enforceability of an heir hunter percentage fee in *In re Estate of Katze-Miller*, 158 Wis. 2d 559, 463 N.W.2d 853 (Ct. App.), *review granted sub nom. Gertsch v. International Equity*, 158 Wis. 2d lxix (Wis. 1990). An heir-search enterprise, International Equity Research Corporation (IER), discovered a newspaper advertisement regarding an estate that was searching for missing heirs. 158 Wis. 2d at 564-65. IER performed a search and found two living heirs. It sent letters to each heir informing them that some estate assets were due to them, but refusing to divulge more information unless the heirs agreed to assign 40 percent of their interest in the estate to IER. 153 Wis. 2d at 565 n.4. The heirs agreed to the assignment, but later contested its validity in court. The Wisconsin court found that the assignment was valid and enforceable and not illegal, against public policy or unconscionable. The court noted that percentage fees were commonplace in business and that IER provided detailed work and effort to locate the heirs. The court further noted that the "heirs were under no compulsion to accept the offered services". 158 Wis. 2d at 579.

## IV

### QUANTUM MERUIT AND ARBITRABILITY

Finally, Nelson assigns error to the trial court's failure to consider his quantum meruit claim, and to its failure to compel enforcement of the agreement by an arbitrator. Because we have concluded that the trial court erred in granting summary judgment to McGoldrick, it is unnecessary for us to consider his quantum meruit claim. Insofar as arbitrability is concerned, Nelson does not present any argument or citation to authority on this issue. Thus, we decline to discuss it. RAP 10.3(a)(5).

## V

### ATTORNEY FEES

Nelson claims reasonable attorney fees on appeal pursuant to the provisions of RCW 4.84.330, which provide for attorney fees "where such contract or lease specifically provides that attorney's fees and costs . . . shall be awarded to one of the parties".

There is no attorney fee provision in the instant agreement, and, thus, there is no entitlement to fees on that basis. Nelson also requests fees on equitable grounds. In certain limited circumstances, a party may recover fees on recognized equitable grounds. *Pennsylvania Life Ins. Co. v. Department of Empl. Sec.*, 97 Wn.2d 412, 413, 645 P.2d 693 (1982). However, given that the agreement provides for a fee equal to one-half of the Panorama stock in return for the services, we find no reason to consider an award of fees on any equitable ground.

Because we conclude, as a matter of law, that the agreement between Nelson and McGoldrick is not void, we reverse the trial court's order granting summary judgment to McGoldrick. We remand for a trial on remaining factual issues relating to McGoldrick's contention that Nelson did not perform his obligations under the contract.

MORGAN, C.J., concurs.

ALEXANDER, J. (dissenting) — I respectfully dissent from the majority opinion. I do so because, in my judgment, the trial court correctly determined that the agreement between Nelson and McGoldrick was unconscionable and, therefore, void and unenforceable. Furthermore, I am satisfied that we should affirm the trial court for an additional reason that it did not rely upon — the contract was illegal. I will, hereafter, discuss each of my reasons for this dissent.

## I

If the contract between Nelson and McGoldrick is not substantively unconscionable, it is hard to imagine one that is. In my opinion, a contract where a party agrees to secure property, the location of which is already known to that party, in return for a promise from the rightful owner of the property to pay the first party approximately $25,000, that agreement is "shocking to the conscience", "monstrously harsh", "exceedingly calloused", or whatever other term that has ever been used in case law to describe an unconscionable contract. To my way of thinking, the underlying nature of this contract is not less unconscionable simply because Nelson routinely does this sort of a thing as a business and calls himself an "heir finder" or "heir hunter". The plain fact is that when Nelson entered into this contract with McGoldrick, he already knew where the Panorama stock was located and that it would be an easy task to obtain it for her. That being the case, the amount of compensation provided for in the agreement was so far beyond what can be termed reasonable that it can only be described as an outrageous fee.

This fee agreement cannot be equated to a contingent fee agreement between an attorney and a client, where a reasonable fee can only be earned if the attorney performs services in order to obtain a favorable result for the client. Here Nelson knew that McGoldrick's stock was at Panorama's headquarters. The only real work that Nelson had to do was to obtain McGoldrick's agreement to pay him an exorbitant fee.

It is significant that fees for those who seek compensation from persons whose lost property is in the hands of the State Department of Revenue are limited to 5 percent of the value of the property returned to the owner. RCW 63.29.350. While I agree with the majority that the aforementioned statute does not control what is an appropriate fee here, it is, at least, a measuring rod against which the fee that is sought here can be measured. The fee here, which was 50 percent of the value of the property, so far dwarfs the fees that are permitted by statute in that similar situation, it cries out that the agreement is substantively unconscionable.

## II

As the majority points out, Washington courts will not enforce contracts which grow out of illegal acts. In my judgment, this contract should not be enforced because it allows Nelson to extort a reward for obtaining McGoldrick's property for her. Although, as I have noted above, the trial court did not conclude on summary judgment that the contract was illegal, our review of a summary judgment ruling is de novo and the trial judge can be affirmed on any alternate ground within the pleadings and proof. *Carey v. Reeve*, 56 Wn. App. 18, 23, 781 P.2d 904 (1989).

It is extortion for a person to knowingly attempt to obtain money from another person by "threat". RCW 9A.56.110. A "threat", according to RCW 9A.04.110(25)(g), means to communicate the intent to withhold information from another with regard to that other person's legal claim. In essence, Nelson threatened to not tell McGoldrick where her property was unless she paid him $25,000. That is extortion, and it is not made less so because Nelson and McGoldrick negotiated the fee and memorialized their "negotiating" to a writing.

## III

I am disappointed, after all, that this court has put its imprimatur on this very seedy arrangement. I am concerned that the majority's opinion can only serve to encourage persons to withhold information from property owners about their lost property as a sort of ransom in order to extract a

reward. In spite of the majority's opinion, I can only hope that most people will not be motivated to take the low road in such circumstances, but, rather, will be inclined to assist property owners locate their property. Hopefully, a grateful property owner will be motivated to voluntarily pay a reasonable reward to a finder of lost property. If, however, a reward is not forthcoming, virtue will have to suffice as the finder's reward.

Reconsideration denied June 21, 1994.

Affirmed at 127 Wn.2d 124.