[No. 9240–5–I. Division One. July 16, 1982.]

GORDON JEFFERY, ET AL, *Respondents,* v. NANCY
WEINTRAUB, ET AL, *Appellants.*

*Perkins, Coie, Stone, Olsen & Williams* and *Lawrence B. Ransom,* for appellants.

*Clinton H. Hattrup,* for respondents.

RINGOLD, J.—The defendants (homeowners), owners of 13 floating homes moored at a facility[1] owned and operated by plaintiffs Gordon Jeffery and Margaret Jeffery (Jeffery),

---

[1]The moorage facility, located at Lake Union in Seattle, extends some 310 feet from shore. Jeffery owns the submerged land within 160 feet from shore, and leases the remaining 150 feet from the State of Washington.

appeal a summary judgment for unpaid increases in moorage fees (rent). Jeffery cross–appeals the award of a single statutory attorneys fee in the consolidated superior court proceeding. We affirm the judgment of the Superior Court, but modify the effective date of the rent increase and remand for redetermination of statutory attorneys fees.

On May 29, 1979, Jeffery gave notice to the homeowners that moorage rates would increase approximately 20 percent, or $30 per month, effective July 1, 1979. The homeowners then petitioned the City of Seattle for factfinding pursuant to ordinance 107012.[2] A fact finder was appointed

---

[2]Ordinance 107012, known as the "Equity Ordinance," was codified at Seattle Municipal Code ch. 7.20 and provided in pertinent part as follows:

"Section 4. If a floating home owner believes that a demanded moorage fee increase is unreasonable, such floating home owner, or any group of similarly affected floating home owners, may file a Petition for Fact–Finding with the Mayor. Such petition shall be filed within fifteen days of receipt by such floating home owner or owners of written notification of such moorage fee increase. . . .

"Section 5. After the filing of a Petition for Fact–Finding, the Mayor shall within seven days notify the floating home moorage owner of such filing and shall within fifteen days of the filing of such petition appoint a qualified person from a panel approved by the American Arbitration Association to conduct fact–finding proceedings to consider the justification and reasonableness of the demanded moorage fee increase. . . .

"Section 6. The fact–finder shall conduct a public hearing for the purpose of making a factual determination as to whether the demanded moorage or increase is reasonable in amount. The moorage owner or operator, whichever would benefit from the demanded moorage fee increase, shall be required to be present at the hearing. The reasonableness of the moorage fee increase shall be evaluated upon the basis of whether such moorage fee constitutes a fair and reasonable return upon the current value of the property of the owner of the floating home moorage which is devoted to such use, and in making such evaluation the fact–finder, in addition to any other factors he or she deems relevant, shall consider the following factors:

"(1) increases or decreases in the Consumer Price Index for residential rents in Seattle, Washington as determined by the United States Department of Labor, Bureau of Labor Statistics;

"(2) increases or decreases in property taxes placed upon the floating home moorage;

"(3) increases or decreases in the expenses of operation and maintenance of the floating home moorage, provided that such expenses are for services, repairs, property maintenance, utilities, or any other such expenses which are necessary or reasonable for the continued operation of a floating home moorage.

on July 9, 1979, and a hearing was held September 5, 1979. The fact finder in his decision of September 27, 1979, concluded that not only was the proposed increase unreasonable, but "[a]ny increase in the fees currently charged would be unreasonable." Following the factfinding, Jeffery notified the homeowners that regardless of the fact finder's decision, the increased rental would take effect on September 8, 1979, with all arrearages due November 1, 1979. The homeowners continued to pay moorage fees but refused to pay the increase.

"(4) the reasonable costs of capital improvements to the floating home moorage property which benefit the floating home owners occupying moorage sites at such floating home moorage.

"(5) increases or decreases in necessary or desirable services furnished by the floating home moorage owner or operator where such increased or decreased services affect the person or persons initiating the fact–finding proceedings.

"(6) substantial deterioration in the facilities provided for the occupants of moorage sites at such floating home moorage due to failure of the floating home moorage owner or operator to perform ordinary repairs, replacement and maintenance of the floating home moorage property and improvements.

"(7) the current fair market value of the floating home moorages.

"(8) comparability with moorage fees charged for other floating home moorage sites in the City.

"Section 7. . . . After the completion of such public hearing the fact–finder shall issue a preliminary decision as to the reasonableness of the demanded moorage fee increase. If the preliminary decision does not support the demanded moorage fee increase in whole or in part, the fact–finder shall call the parties together and suggest a resolution of the moorage fee dispute that is supported by the fact–finder's preliminary decision. If no agreement is reached by the parties, the fact–finder shall issue his final decision as to the reasonableness of the demanded moorage fee increase. The fact–finding proceedings shall be concluded either by agreement or by issuing a final decision within 60 days of the appointment of the fact–finder. No contested moorage fee increase shall take effect until the conclusion of fact–finding proceedings; provided that the moorage owner or operator may recover retroactively such increases as are found reasonable by the fact–finder. At any time during the fact–finding proceeding the parties thereto by mutual voluntary written agreement may request that the fact–finder serve as an arbitrator to finally determine the dispute concerning moorage fees pursuant to R.C.W. 7.04.010 through 7.04.220, and any such arbitration shall be conducted in accordance with the Rules of the American Arbitration Association and judgment on the award may be entered in any court having jurisdiction thereof."

Ordinance 107012 became effective December 21, 1977, and was repealed by the passage of ordinance 109280, effective September 21, 1980. *See* Seattle Municipal Code, ch. 7.20.

Jeffery brought 14 separate actions in district court against the delinquent homeowners, which were consolidated by agreement of the parties. Following judgment in Jeffery's favor, 13 of the homeowners appealed to the superior court for a trial de novo. The Superior Court granted Jeffery's motion for summary judgment and the homeowners appeal.

## Effect of Fact Finder's Decision

The homeowners contend that under the Equity Ordinance, the fact finder's decision that the increase was unreasonable is binding on the parties and prevents Jeffery from charging an increased fee. They argue that if the city council had not intended the fact finder's decision to be binding, the ordinance would have explicitly so provided, as in the Educational Employment Relations Act, RCW 41.59.120(2), which provides that "the fact–finder shall make findings of fact and recommend terms of settlement . . . which recommendations shall be advisory only."

■ Our task in construing a statute is to give effect to the intent of the Legislature. *Janovich v. Herron*, 91 Wn.2d 767, 592 P.2d 1096 (1979). We hold that the trial court did not err in concluding that the Legislature intended the fact finder's decision to have no binding effect.[3]

■ The stated purpose of a statute is an important indicium of legislative intent. *Whatcom Cy. v. Langlie*, 40 Wn.2d 855, 246 P.2d 836 (1952). The purpose of the ordinance, as expressed in its title, was to establish "a fact–finding process to aid the settlement of disputes over moorage fees between floating home owners and owners of floating home moorages." The factfinding is characterized

---

[3]In *Kennedy v. Seattle*, 94 Wn.2d 376, 617 P.2d 713 (1980), not cited by either party here, the Supreme Court upheld the constitutionality of the factfinding provisions of the Equity Ordinance. Although the court stated at pages 380–81, in describing the ordinance, that "it allows a houseboat owner to have the approval of a fact finder before any increase in rent can be made by the moorage owner", the issue of the binding effect, if any, of the fact finder's decision was not before the court; any implication that the fact finder's decision is binding is therefore dicta.

as *aiding* dispute settlement, not as finally settling the dispute.

Statements by the chairperson of the committee in charge of legislation have been used by courts in determining legislative intent. *Snow's Mobile Homes, Inc. v. Morgan,* 80 Wn.2d 283, 494 P.2d 216 (1972). The chairman's comments indicate that the fact finder's decision was not intended to be binding on the parties.[4]

### UNCONSCIONABILITY

The homeowners next contend that by granting summary judgment to Jeffery the trial court denied them an opportunity to prove that the moorage fee increases were unconscionable, hence unenforceable at law. They cite *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 544 P.2d 20 (1975), for the proposition that the issue of unconscionability may not be determined at summary judgment, and argue that they are entitled to a full hearing in order to present evidence of unconscionability.

 While the court in *Schroeder,* after exploring the concept of unconscionability under the Uniform Commercial Code (UCC),[5] stated at page 262, "In accordance with

---

[4]At the council meeting before the ordinance was passed the chairman stated:

"This is where this proposal differs from the original suggestion which had rent arbitration in it. This has a fact–finding process. And, if there is a complaint—it works on a complaint basis—from a floating home owner, they can request this fact–finding process and the owner, or he who benefits from the increase, *is obliged to attend this process and justify or explain the proposed* rental increase in terms of inflation, tax assessments, improvements to the property, comparable rent structures, etc. And the fact–finder will issue a report at the end stating whether he feels that this is a justifiable increase or not, and if not, why not, and what it should be and in general, try and—if it's too much, convince the owner that it is too much and maybe get an adjustment. In the end the fact–finder does not have the ability to set the rents, but it is felt that (1) a frankly unreasonable increase is less likely if there is this kind of, the prospect of this kind of a process and (2) if you're going to be a bum, you're going to be a bum in public. It's a moral suasion, it [*sic*] a jawboning kind of process and it is, we are hoping that that will meet the problem."

[5]RCW 62A.2–302 provides:

Unconscionable contract or clause. (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the

the requisites set forth above, a court is not authorized to dispose of this issue under the rules governing summary judgment", this statement is dicta and not binding on this court. *Schroeder* was an appeal from a judgment after trial and did not concern a summary judgment. The court made its statement as part of a general exposition on unconscionability and not as part of its holding. *See, e.g., State ex rel. Johnson v. Funkhouser,* 52 Wn.2d 370, 325 P.2d 297 (1958).

We see no reason why principles of summary judgment should not apply to test the legal sufficiency of the facts underlying a claim of unconscionability. Although unconscionability is a matter of law to be decided by the trial court, *Schroeder,* at 262, the decision is one based on the factual circumstances surrounding the transaction in question. *Christiansen Bros. v. State,* 90 Wn.2d 872, 586 P.2d 840 (1978). The purpose of summary judgment is to avoid a useless trial where there are no material facts at issue. *LaPlante v. State,* 85 Wn.2d 154, 531 P.2d 299 (1975). If the material facts are undisputed, and when looked at in the light most favorable to the party alleging unconscionability are insufficient to establish unconsciona-

---

time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Although the contract in *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 544 P.2d 20 (1975), arose under the UCC, the doctrine of unconscionability is available outside the UCC context. *See, e.g., Christiansen Bros. v. State,* 90 Wn.2d 872, 586 P.2d 840 (1978); *Montgomery Ward & Co. v. Annuity Bd.,* 16 Wn. App. 439, 556 P.2d 552 (1976). We assume without deciding that a "reasonable opportunity to present evidence" is required in a non–UCC case as well as one claiming unconscionability under the UCC. Other courts have held, as we do now, that a hearing on a motion for summary judgment gives the parties the "reasonable opportunity to present evidence" contemplated under RCW 62A.2–302(2). *See Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Hawaii 466, 540 P.2d 978 (1975), and cases cited therein.

bility, there is no need for the trial court to inquire further. Absent a threshold showing of unconscionability sufficient to survive summary judgment, the issue disappears from the case.

■ To prevail on summary judgment, the moving party must present facts showing that it is entitled to judgment as a matter of law. Once the initial showing is made, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." CR 56(e); *LaPlante v. State, supra.* Jeffery's uncontroverted affidavit established the amount of the moorage fee increase and the homeowners' refusal to pay it, thereby meeting the initial burden. The homeowners responded with the affidavit of one of the individual homeowners, which contains the following relevant to the claimed unconscionability:

> 3. Because of a variety of circumstances including, most notably, a number of statutes and regulations restricting and regulating use of the waterfronts in and around Seattle, including Lake Union, there is no legal place to which she can move her floating home. There are not any additional places for existing floating homes in the Seattle area.
>
> 4. She has never had any choice as to the moorage fee to be paid to the Moorage Owners for moorage space for her floating home, or as to other terms and conditions of her tenancy. Except for the fact–finding process which enables her to obtain a determination of the reasonableness of the moorage fee demanded by the Moorage Owners, she has never had any ability to bargain about or otherwise have an effect upon the amount of the fee demanded. Her only choice other than through litigation is either to pay the amount demanded or move her floating home, and if she were to remove her floating home, she would have to dismantle it and sell it for scrap as there is no legal place in the area to put it other than where it is presently located.
>
> . . .
>
> 6. The moorage fee demanded by the Moorage Owners is, under the circumstances, an unreasonable and unconscionable moorage fee, and should not be enforceable.

Jeffery responded with the affidavit of his attorney to the

effect that at the time of the increase and continuing to the present there was an established market for the sale of floating homes at prices varying from $40,000 to $80,000, and that as of May 13, 1980, two new houseboat moorages were available for rent in the Portage Bay area. This affidavit also related that the contested increase in moorage fees was less than the corresponding rise in the Consumer Price Index for the same period. The homeowners made no further response.

While the affidavits arguably raise issues of fact, such as the scarcity of moorages and the evanescence of the homeowners' lifestyle, none is material to the issue of unconscionability. What is material, and seems to us dispositive, is the homeowners' failure to set forth unconscionable circumstances at the time of the initial contract, when they first decided to moor their homes at Jeffery's facility. The relevant inquiry when unconscionability is claimed is into the circumstances "at the time the contract is made." Restatement (Second) of Contracts § 208 (1981).[6] The record is barren as to the relative bargaining power of the parties at the time of the initial contract. The homeowners nowhere allege that the specter of moorage fee increases was not foreseeable. Nor do they contend that they were forced to live in floating homes, or that they are prevented from changing their lifestyle if they so choose. We must conclude, on this record, that they had the power, at the time of their initial bargain with Jeffery, to either contract for an acceptable moorage fee schedule or to live elsewhere. *See Christiansen Bros. v. State, supra.*

---

[6]Although the contract between Jeffery and the homeowners appears at first blush to arise anew each month, we refer to conditions at the time of the initial decision to moor for our determination of conscionability. As the court stated in *Kennedy v. Seattle, supra,*

> If a houseboat owner is on a moorage and does not violate other portions of the houseboat ordinance, it is impossible for the houseboat owner to be evicted and impossible for the owner of the moorage to use the moorage for the owner's residence.

94 Wn.2d at 386. The contract is much more akin to a lease from the original date of moorage than a month to month tenancy.

Synonyms for unconscionable include "shocking to the conscience" and "monstrously harsh." *Montgomery Ward & Co. v. Annuity Bd.*, 16 Wn. App. 439, 444, 556 P.2d 552 (1976). The moorage fee increase here before us is neither. In the absence of a showing of unconscionability sufficient to merit further inquiry, summary judgment was proper.

### STATE ACTION IN VIOLATION OF DUE PROCESS

We understand the homeowners to argue that if state action is present an unreasonable rent increase constitutes a deprivation of property without due process of law. They claim that there was a genuine issue of material fact as to the presence of state action, because the State owns and leases to Jeffery a portion of the land on which the moorage facility is situated. They also point to the statutes and regulations governing shoreline use and argue that the State has given Jeffery monopoly power over the owners of floating homes moored at the facility.

Even if we assume that the State's ownership of part of the submerged land used for the moorage facility brings the fee increase into the realm of state action sufficient to implicate the protections of the Fourteenth Amendment,[7] the homeowners have not raised a genuine issue of material fact as to the claimed due process violation. But for the bare assertion that imposition of an "unreasonable" moorage fee increase violates the due process clause, the home-

---

[7]*See, e.g., Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961); *MacLean v. First Northwest Indus. of Am., Inc.*, 24 Wn. App. 161, 600 P.2d 1027 (1979), *rev'd*, 96 Wn.2d 338, 635 P.2d 683 (1981). Under the present state of the law in Washington it is unclear whether the fact that the State leases property to a private person is a sufficient nexus to characterize as state action the otherwise private conduct of the lessee with regard to the leased property. The Court of Appeals in *MacLean* found that allegedly discriminatory "ladies' night" admission pricing for basketball games constituted state action because the games were played at a stadium leased from the City of Seattle. 24 Wn. App. at 165. Although the majority opinion of the Supreme Court reversing *MacLean* expressed doubt as to this court's finding of state action, 96 Wn.2d at 348 n.4, it reversed the decision on other grounds. A strong dissent argued in part that the Court of Appeals finding of state action was correct. *MacLean*, at 353–59 (Dolliver, J., dissenting).

owners cite no authority to justify this request for judicial rent control. We will not consider an argument, absent citation of relevant authority, unless it is well taken on its face. *State v. Kroll*, 87 Wn.2d 829, 558 P.2d 173 (1976).

## EFFECTIVE DATE OF THE FEE INCREASE

Section 7 of ordinance 107012 reads in part:

The fact–finding proceedings shall be concluded either by agreement or by issuing a final decision within 60 days of the appointment of the fact–finder. No contested moorage fee increase shall take effect until the conclusion of fact–finding proceedings . . .

The fact finder was appointed by the mayor on July 9, 1979, but did not announce his decision until September 27, 1979, 20 days past the 60–day deadline. The judgment of the trial court granted Jeffery recovery of the rent increases "from the effective date of September 7, 1979."

The homeowners contend that the plain language of the ordinance requires the fee increases to be effective September 27, 1979, the date the factfinding proceedings concluded. Jeffery argues that the ordinance suspends the increases 60 days pending factfinding, making the fee increase effective September 7, 1979.

Although the ordinance did not contemplate the issuance of a decision more than 60 days after the appointment of a fact finder, the record shows no objection by Jeffery to the fact finder's delay. By failing to make a timely objection at the end of the 60–day period Jeffery waived the right to the increases at that time. We modify the trial court's order to reflect an effective date for the increases of September 27, 1979, the date the factfinding process concluded.

## STATUTORY ATTORNEYS FEES

Jeffery brought 14 actions in the district court which were consolidated, upon the motion of all parties, "for all further proceedings herein, including trial." The district court entered 14 judgments in Jeffery's favor, allowing costs consisting in part of a $25 statutory attorneys fee against each defendant. On appeal to the superior court, Jeffery

again moved to consolidate, arguing

> That all of the thirteen causes set forth above have virtually identical factual issues and legal issues. That all of the Defendants–Appellants are represented by one counsel and that it would effect an economy of time, on both the Court, the parties and the attorneys, as well as costs if they were consolidated for purposes of trial.

The actions were again "consolidated for all further proceedings."

On granting Jeffery's single motion for summary judgment, the court entered 13 separate judgments against the homeowners. The superior court judgments granted Jeffery multiple statutory attorneys fees as costs for the district court action,[8] but awarded a single $35 statutory attorneys fee against defendant Weintraub for the superior court action. Both sides assign error to the determination of costs, the homeowners arguing against the multiple award of district court attorneys fees, and Jeffery contending on cross appeal that multiple fees should have been awarded in superior court as well.

An order of consolidation effectively discontinues the separate actions and creates a single new and distinct action; the fact that separate judgments are entered does not overcome the effect of the consolidation. *First Nat'l Bank v. Fowler,* 51 Wash. 638, 99 P. 1034 (1909). A general order of consolidation "for all purposes" includes the rendition of a single judgment. *See Johnson v. California–Washington Timber Co.,* 159 Wash. 214, 292 P. 418 (1930).

Despite the effect of a consolidation on the existence of the underlying separate actions, the Supreme Court has approved awards of multiple statutory attorneys fees under certain circumstances. In *Gray's Harbor Boom Co. v. McAmmant,* 21 Wash. 465, 58 P. 573 (1899), the plaintiff brought separate actions against multiple defendants to

---

[8]The superior court judge in an appeal from district court is not bound by the cost award rendered in that court, but rather may assess all costs against the nonprevailing appellant, including those incurred in the district court, as part of the superior court judgment. *See* RCW 4.84.130.

foreclose liens on cut timber. The actions were consolidated for trial. The court granted a nonsuit at the close of the plaintiff's case, entered separate judgments of dismissal against the plaintiff, and taxed costs including a statutory attorneys fee in each case. The Supreme Court affirmed the cost award, holding that each defendant "was entitled to the statutory costs awarded him." *Gray's Harbor Boom Co.*, at 469. In *Hanson v. Blackwell Motor Co.*, 143 Wash. 547, 255 P. 939, 52 A.L.R. 851 (1927), two actions against Blackwell by separate parties for personal injuries arising out of a single auto accident were consolidated for trial. Following judgment for Blackwell, the court assessed costs against each plaintiff, including individual awards of statutory attorneys fees. The Supreme Court cited *Gray's Harbor Boom Co.* and affirmed the award of costs: "The cases were consolidated, as stated, for the purpose of trial. Separate judgments of dismissal were entered. The costs objected to were properly taxed." *Hanson*, at 556–57.

■ Although the court in these two cases upheld multiple awards of statutory attorneys fees once granted below, we do not believe that *Gray's Harbor Boom Co.* and *Hanson* give rise to a rule requiring multiple fees in all cases where separate actions are consolidated. The statutes, which provide only that the prevailing party is entitled to its costs and disbursements, including a $25 attorneys fee in district court, RCW 12.20.060, and a $35[9] attorneys fee in superior court, RCW 4.84.080, do not resolve the situation before us. Under RCW 4.84.190, decisions on cost awards not specifically covered by statute are left to the discretion of the trial court. We hold that the decision to allow a single fee for the consolidated action or a separate fee in each underlying action is within the sound discretion of the trial court.

Factors to be considered by the trial court in exercising its discretion on this issue include, but are not limited to,

---

[9] The $35 fee has been raised to $100 since the time of judgment in this case. Laws of 1981, ch. 331, § 3, p. 1560.

the convergence or divergence of the factual and legal issues among the consolidated actions, the identity of interest among the multiple parties, the representation of the multiple parties by single or multiple counsel, and the necessity that the prevailing party expend greater time and effort in the litigation of the consolidated action than would have been necessary in a single action against one of the multiple parties.

It is appropriate that the trial court reassess costs in accord with the views expressed herein. Without some foundation in the record justifying different treatment in district and superior courts, Jeffery should recover either a single fee in both courts or multiple fees in both courts, not a single fee in superior court and multiple fees in district court.[10]

The judgment as modified is affirmed, with costs to Jeffery,[11] and remanded for redetermination of statutory attorneys fees.

DURHAM, A.C.J., concurs.
WILLIAMS, J., concurs in the result.

---

[10]We note that the imposition of the entire superior court statutory attorneys fee on just one of the 13 defendants (Weintraub) is manifestly unfair; each defendant should be required to pay a pro rata share of the statutory attorneys fees incurred in both superior and district courts.

[11]The practice in this court in a consolidated case such as this is to award but one statutory attorneys fee to the prevailing party.