**Rich HILL and Enza Hill, on behalf of a class of persons similarly situated, Plaintiffs–Appellees,**

v.

**GATEWAY 2000, INC., and David Prais, Defendants–Appellants.**

No. 96–3294.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1996.

Decided Jan. 6, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 3, 1997.

Daniel A. Edelman (argued), Cathleen M. Combs, James O. Latturner, Charles E. Pet-it, Edelman & Combs, Chicago, IL, for Plain-tiffs–Appellees.

Terry M. Grimm, Thomas J. Wiegand, Winston & Strawn, Robert M. Rader (argued), Winston & Strawn, Washington, DC, for Defendants–Appellants.

Before CUMMINGS, WOOD, Jr., and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

A customer picks up the phone, orders a computer, and gives a credit card number. Presently a box arrives, containing the computer and a list of terms, said to govern unless the customer returns the computer within 30 days. Are these terms effective as the parties' contract, or is the contract term-free because the order-taker did not read any terms over the phone and elicit the customer's assent?

One of the terms in the box containing a Gateway 2000 system was an arbitration clause. Rich and Enza Hill, the customers, kept the computer more than 30 days before complaining about its components and performance. They filed suit in federal court arguing, among other things, that the product's shortcomings make Gateway a racketeer (mail and wire fraud are said to be the predicate offenses), leading to treble damages under RICO for the Hills and a class of all other purchasers. Gateway asked the district court to enforce the arbitration clause; the judge refused, writing that "[t]he present record is insufficient to support a finding of a valid arbitration agreement between the parties or that the plaintiffs were given adequate notice of the arbitration clause." Gateway took an immediate appeal, as is its right. 9 U.S.C. § 16(a)(1)(A).

The Hills say that the arbitration clause did not stand out: they concede noticing the statement of terms but deny reading it closely enough to discover the agreement to arbitrate, and they ask us to conclude that they therefore may go to court. Yet an agreement to arbitrate must be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. *Doctor's Associates, Inc. v. Casarotto*, —— U.S. ——, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), holds that this provision of the Federal Arbitration Act is inconsistent with any requirement that an arbitration clause be prominent. A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome. *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544, 547 (7th Cir.1996); *Chicago Pacific Corp. v. Canada Life Assurance Co.*, 850 F.2d 334 (7th Cir.1988). Terms inside Gateway's box stand or fall together. If they constitute the parties' contract because the Hills had an opportunity to return the computer after reading them, then all must be enforced.

*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir.1996), holds that terms inside a box of software bind consumers who use the software after an opportunity to read the terms and to reject them by returning the product. Likewise, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), enforces a forum-selection clause that was included among three pages of terms attached to a cruise ship ticket. *ProCD* and *Carnival Cruise Lines* exemplify the many commercial transactions in which people pay for products with terms to follow; *ProCD* discusses others. 86 F.3d at 1451–52. The district court concluded in *ProCD* that the contract is formed when the consumer pays for the software; as a result, the court held, only terms known to the consumer at that moment are part of the contract, and provisos inside the box do not count. Although this is one way a contract

could be formed, it is not the only way: "A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance." *Id.* at 1452. Gateway shipped computers with the same sort of accept-or-return offer ProCD made to users of its software. *ProCD* relied on the Uniform Commercial Code rather than any peculiarities of Wisconsin law; both Illinois and South Dakota, the two states whose law might govern relations between Gateway and the Hills, have adopted the UCC; neither side has pointed us to any atypical doctrines in those states that might be pertinent; *ProCD* therefore applies to this dispute.

Plaintiffs ask us to limit *ProCD* to software, but where's the sense in that? *ProCD* is about the law of contract, not the law of software. Payment preceding the revelation of full terms is common for air transportation, insurance, and many other endeavors. Practical considerations support allowing vendors to enclose the full legal terms with their products. Cashiers cannot be expected to read legal documents to customers before ringing up sales. If the staff at the other end of the phone for direct-sales operations such as Gateway's had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers. Others would hang up in a rage over the waste of their time. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it. Writing provides benefits for both sides of commercial transactions. Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device. Competent adults are bound by such documents, read or unread. For what little it is worth, we add that the box from Gateway was crammed with software. The computer came with an operating system, without which it was useful only as a boat anchor. See *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756, 761 (7th Cir.

1996). Gateway also included many application programs. So the Hills' effort to limit *ProCD* to software would not avail them factually, even if it were sound legally—which it is not.

For their second sally, the Hills contend that ProCD should be limited to executory contracts (to licenses in particular), and therefore does not apply because both parties' performance of this contract was complete when the box arrived at their home. This is legally and factually wrong: legally because the question at hand concerns the *formation* of the contract rather than its *performance*, and factually because both contracts were incompletely performed. *ProCD* did not depend on the fact that the seller characterized the transaction as a license rather than as a contract; we treated it as a contract for the sale of goods and reserved the question whether for other purposes a "license" characterization might be preferable. 86 F.3d at 1450. All debates about characterization to one side, the transaction in *ProCD* was no more executory than the one here: Zeidenberg paid for the software and walked out of the store with a box under his arm, so if arrival of the box with the product ends the time for revelation of contractual terms, then the time ended in *ProCD* before Zeidenberg opened the box. But of course ProCD had not completed performance with delivery of the box, and neither had Gateway. One element of the transaction was the warranty, which obliges sellers to fix defects in their products. The Hills have invoked Gateway's warranty and are not satisfied with its response, so they are not well positioned to say that Gateway's obligations were fulfilled when the motor carrier unloaded the box. What is more, both ProCD and Gateway promised to help customers to use their products. Long-term service and information obligations are common in the computer business, on both hardware and software sides. Gateway offers "lifetime service" and has a round-the-clock telephone hotline to fulfil this promise. Some vendors spend more money helping customers use their products than on developing and manufacturing them. The document in Gateway's box includes promises of

future performance that some consumers value highly; these promises bind Gateway just as the arbitration clause binds the Hills.

Next the Hills insist that *ProCD* is irrelevant because Zeidenberg was a "merchant" and they are not. Section 2–207(2) of the UCC, the infamous battle-of-the-forms section, states that "additional terms [following acceptance of an offer] are to be construed as *proposals for addition to a contract. Between merchants such terms become part of the contract unless* ...". Plaintiffs tell us that *ProCD* came out as it did only because Zeidenberg was a "merchant" and the terms inside ProCD's box were not excluded by the "unless" clause. This argument pays scant attention to the opinion in *ProCD,* which concluded that, when there is only one form, "sec. 2–207 is irrelevant." 86 F.3d at 1452. The question in *ProCD* was not whether terms were added to a contract after its formation, but how and when the contract was formed—in particular, whether a vendor may propose that a contract of sale be formed, not in the store (or over the phone) with the payment of money or a general "send me the product," but after the customer has had a chance to inspect both the item and the terms. *ProCD* answers "yes," for merchants and consumers alike. Yet again, for what little it is worth we observe that the Hills misunderstand the setting of *ProCD.* A "merchant" under the UCC "means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction", § 2–104(1). Zeidenberg bought the product at a retail store, an uncommon place for merchants to acquire inventory. His corporation put ProCD's database on the Internet for anyone to browse, which led to the litigation but did not make Zeidenberg a software merchant.

At oral argument the Hills propounded still another distinction: the box containing ProCD's software displayed a notice that additional terms were within, while the box containing Gateway's computer did not. The difference is functional, not legal. Consumers browsing the aisles of a store can look at the box, and if they are unwilling to deal with the prospect of additional terms can leave the box alone, avoiding the transactions costs of returning the package after reviewing its contents. Gateway's box, by contrast, is just a shipping carton; it is not on display anywhere. Its function is to protect the product during transit, and the information on its sides is for the use of handlers

("Fragile!" "T      Up!" &#x262e; &#x1f3f9;&#x2b06;&#x2b06;)

rather than would-be purchasers.

Perhaps the Hills would have had a better argument if they were first alerted to the bundling of hardware and legal-ware after opening the box and wanted to return the computer in order to avoid disagreeable terms, but were dissuaded by the expense of shipping. What the remedy would be in such a case—could it exceed the shipping charges?—is an interesting question, but one that need not detain us because the Hills knew before they ordered the computer that the carton would include *some* important terms, and they did not seek to discover these in advance. Gateway's ads state that their products come with limited warranties and lifetime support. How limited was the warranty—30 days, with service contingent on shipping the computer back, or five years, with free onsite service? What sort of support was offered? Shoppers have three principal ways to discover these things. First, they can ask the vendor to send a copy before deciding whether to buy. The Magnuson–Moss Warranty Act requires firms to distribute their warranty terms on request, 15 U.S.C. § 2302(b)(1)(A); the Hills do not contend that Gateway would have refused to enclose the remaining terms too. Concealment would be bad for business, scaring some customers away and leading to excess returns from others. Second, shoppers can consult public sources (computer magazines, the Web sites of vendors) that may contain this information. Third, they may inspect the documents after the product's delivery. Like Zeidenberg, the Hills took the third option. By keeping the computer beyond 30 days, the Hills accepted Gateway's offer, including the arbitration clause.

■ The Hills' remaining arguments, including a contention that the arbitration

clause is unenforceable as part of a scheme to defraud, do not require more than a citation to *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Whatever may be said pro and con about the cost and efficacy of arbitration (which the Hills disparage) is for Congress and the contracting parties to consider. Claims based on RICO are no less arbitrable than those founded on the contract or the law of torts. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 238–42, 107 S.Ct. 2332, 2343–46, 96 L.Ed.2d 185 (1987). The decision of the district court is vacated, and this case is remanded with instructions to compel the Hills to submit their dispute to arbitration.