[No. 41304-0-I. Division One. February 1, 1999.]

M.A. MORTENSON COMPANY, INC., *Appellant*, v. TIMBERLINE SOFTWARE CORPORATION, ET AL., *Respondents*.

820

*Catherine C. Clark* and *Bradley L. Powell* of *Oles Morrison Rinker & Baker, L.L.P.* (*Theodore Russell* of *Sheppad Mullin Richter & Hampton, L.L.P.*, of counsel), for appellant.

*Charles E. Peery, Michael E. Ricketts*, and *Michael P. Grace* of *Peery, Hiscock, Pierson & Ryder*; and *Laura Peery Knechtel*, for respondents.

*Robert B. Mitchell, Jr.*, and *Mark H. Wittow* on behalf of Business Software Alliance and Washington Software Alliance, amici curiae.

WEBSTER, J. — Appellant M.A. Mortenson Company licensed specialized software from Respondent Timberline Software Corporation via Respondent Softworks Data Systems (SDS), Timberline's local authorized dealer (the Respondents will be referred to collectively as "Timberline"). The software program is used by contractors in preparation of construction bids. Use of the program is generally subject to a form license agreement that is shipped with the diskettes. Mortenson used the program and encountered an error but nevertheless submitted the bid generated by the program. After submitting the bid, Mortenson discovered that it was two million dollars less than it should have been. Mortenson sued Timberline for breach of warranties. The contract issues to be resolved are: (1) whether the purchase order constituted an integrated contract; (2) whether the license terms are part of

the contract; and (3) if so, whether the limitations of remedies clause is unconscionable. We must also address whether the trial court erred in denying Mortenson's motions to vacate the judgment and amend the pleadings. We find: (1) that the purchase order was not an integrated contract; (2) that the license terms are part of the contract; and (3) that the limitations of remedies clause is enforceable. Thus, we affirm the trial court's order granting summary judgment in favor of Timberline. We also affirm the order denying the motions to vacate and amend.

## BACKGROUND FACTS

The following facts are recited in the light most favorable to Mortenson. *See Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Factual disputes are noted.

A. The Purchase

Prior to early 1993, Mortenson licensed and used the Medallion Version of Timberline's Bid Analysis Software. After upgrading its computer system, Mortenson was forced to upgrade to the then-current version of Timberline's software called Precision.

Mortenson negotiated the price and number of copies of the upgrade with Mr. Reich of SDS. The negotiations concerned a discounted price due to the quantity of copies Mortenson intended to purchase. On May 7, 1993, Reich issued a quote, and on July 12, 1993, Mortenson issued a purchase order confirming the purchase of eight copies of Precision.[1] The purchase order was signed by Neil Ruud of Mortenson and by Reich.

B. The Installation

When the software arrived at SDS, Reich unpacked the cardboard shipping boxes to check the contents against the order but did not unpack the diskettes from the small white

---

[1]Another copy was purchased at a later date for a total of nine copies. Three copies were for Mortenson's Bellevue office, the remaining copies were for Mortenson's Minneapolis and Milwaukee offices.

product boxes in which they were shipped. Reich delivered the software to Mortenson's Bellevue office in July 1993.

At Mortenson's request, Reich returned to Mortenson at a later date to install the software on Mortenson's machines. Mortenson claims that Reich opened the white boxes in which the diskettes were shipped, installed the software, and obtained the activation codes from Timberline. Mortenson asserts that it never saw any licenses or disclaimers pertaining to liability, warranties, or remedies. Mortenson does not recall receiving any manuals with the software shipment.[2]

C. The License Agreement

Timberline shipped the diskettes in sealed envelopes that were placed inside white product boxes. The full text of the license agreement is printed on the outside of each sealed envelope. The license agreement is also printed on the inside cover of the user manuals and a reference to the license appears on the introductory screen each time the program is executed.

The relevant license agreement provisions appear below:

CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS BEFORE USING THE PROGRAMS. USE OF THE PROGRAMS INDICATES YOUR ACKNOWLEDGEMENT THAT YOU HAVE READ THIS LICENSE, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, PROMPTLY RETURN THE PROGRAMS AND USER MANUALS TO THE PLACE OF PURCHASE AND YOUR PURCHASE PRICE WILL BE REFUNDED. YOU AGREE THAT YOUR USE OF THE PROGRAM ACKNOWLEDGES THAT YOU HAVE READ THIS LICENSE, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.

. . .

---

[2]Timberline disputes the facts concerning the installation of the software. Reich claims that when he arrived to install the software, the diskettes were opened and sitting on a desk beside a manual and a protection device. According to Reich, he installed only one copy on one machine and watched while a Mortenson employee installed a second copy on another machine.

LIMITATION OF REMEDIES AND LIABILITY

NEITHER TIMBERLINE NOR ANYONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION, PRODUCTION OR DELIVERY OF THE PROGRAMS OR USER MANUALS SHALL BE LIABLE TO YOU FOR ANY DAMAGES OF ANY TYPE, INCLUDING BUT NOT LIMITED TO, ANY LOST PROFITS, LOST SAVINGS, LOSS OF ANTICIPATED BENEFITS, OR OTHER INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE SUCH PROGRAMS, WHETHER ARISING OUT OF CONTRACT, NEGLIGENCE, STRICT TORT, OR UNDER ANY WARRANTY, OR OTHERWISE, EVEN IF TIMBERLINE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR FOR ANY OTHER CLAIM BY ANY OTHER PARTY. TIMBERLINE'S LIABILITY FOR DAMAGES IN NO EVENT SHALL EXCEED THE LICENSE FEE PAID FOR THE RIGHT TO USE THE PROGRAMS. Some states do not allow limitations on how long an implied warranty lasts and some states do not allow the exclusions or limitations of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

Clerk's Papers (CP) at 305.

D. The Two-Million-Dollar Bug

The Precision program is used by contractors to prepare their final bid the day the bid is due. On December 2, 1993, Mortenson utilized the Precision program in preparing its bid for the Harborview Hospital project. Two employees working with the program on the final bid received an error message that read "Abort: cannot find alternate. Press enter to continue." CP at 200, 203. After the users pressed enter, the program exited to the DOS prompt. Upon reentering the program and returning to the place where they were working, the previously entered data appeared accurate. Mortenson employees assumed they could proceed safely. The program aborted in like fashion five to seven times during bid preparation that day. Mortenson's bid, generated with the help of the Precision program, was two million dollars under what Mortenson later discovered it should have been.

Mortenson and Timberline employees attempted to discover what caused the incorrect bid. The abort was reproduced, but the source of the problem was not determined at that time. After litigation was initiated, Mortenson discovered a Timberline internal memorandum dated May 26, 1993, that alerted software developers that a bug had been found in the version of Precision that Mortenson was using. This bug caused an abort with the same message that Mortenson received and occurred only under specific conditions. The memorandum stated that "[g]iven the unusual criteria for this problem, it does not appear to be a major problem." CP at 224. Other Timberline customers encountered the problem and a newer version of the program was sent to some of these customers. After further analysis in July 1995, a Timberline programmer came to the conclusion that this bug caused the bad alternate keys in Mortenson's file.

E. The Trial Court's Conclusions

The trial court found that the purchase order is not an integrated contract as a matter of law because it did not contain "many of the terms which are germane to this contractual relationship." Report of Proceedings (RP) at 51. The trial court found as a matter of law that the license agreement is conspicuous, not unconscionable, and controlling.

F. Proceedings Below

Mortenson filed its action alleging breach of express and/or implied warranties on December 8, 1995. Timberline moved for summary judgment on July 21, 1997. The trial court granted summary judgment on August 15, 1997. Mortenson moved to vacate the judgment and amend its pleadings on January 14, 1998.

## ANALYSIS

When reviewing an order granting summary judgment, this Court engages in the same inquiry as the trial court. *See Mountain Park*, 125 Wn.2d at 341. "All facts and reasonable inferences are considered in the light most favor-

able to the nonmoving party, and all questions of law are reviewed de novo." *Id.* (internal citations omitted). Summary judgment is affirmed if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See id.*; CR 56(c).

## I. The Contract

The parties apparently agree that Article 2 of the Uniform Commercial Code (UCC) applies to the licensing of computer software. We accept, without deciding, this proposition.[3] *See Aubrey's R.V. Ctr., Inc. v. Tandy Corp.*, 46 Wn. App. 595, 600, 731 P.2d 1124 (1987) ("[b]oth parties agree the provisions of the UCC are applicable" to a dispute involving the lease-purchase of computer hardware and the acquisition of software); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (the UCC is "suitable to govern disputes arising from the sale of custom software"); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675-76 (3d Cir. 1991) (computer software held to fall within the definition of a "good" under the UCC).

### A. The Purchase Order Is Not an Integrated Contract

The dispute in this appeal is not over the existence of a contract but over the nature of its terms. The parties dispute whether the purchase order comprises the entire contract between the parties and whether the license agreement terms are part of the contract.

██ ██ Whether parties intend a written document to be an integration of their agreement is a question of fact. *See Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986). In determining whether an agreement is integrated "the court may consider evidence of negotiations and circumstances surrounding the formation of the contract." *Denny's Restaurants, Inc. v. Security Union Title Ins. Co.*, 71 Wn. App. 194, 202, 859 P.2d 619 (1993) (citing RESTATEMENT (SECOND) OF CONTRACTS § 214). "[I]f reasonable minds can reach but one conclusion" on an issue of fact, it may be

---

[3]UCC Article 2B is currently being drafted to address software licenses and, more broadly, transactions in the digital age.

determined on summary judgment. *Allen v. State*, 118 Wn.2d 753, 760, 826 P.2d 200 (1992).

The parties take § 2-204 as their starting point and both interpret it to their advantage. RCW 62A.2-204 provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Mortenson argues that the purchase order reflects an offer, consideration, and acceptance, and that it satisfies the statute of frauds; thus, the purchase order is sufficient under § 2-204 to show agreement between the parties and constitutes the entire contract. Mortenson also asserts that its understanding of a software license is that a license determines only the number of copies purchased. Timberline argues that under § 2-204 the purchase order shows only the *existence* of an agreement, not its extent. Timberline asserts that § 2-204 allows that a contract may be formed in many ways but does not mandate that all terms are defined as soon as there is evidence of an agreement.

Mortenson's arguments ignore the commercial realities of software sales. Mortenson's purchase of the newer version of the Timberline software package was prompted by its need to upgrade an older version of the program that it licensed at the time. Mortenson licensed other software packages, the licenses of which were similar to Timberline's in that they came with the software, disclaimed warranties, limited remedies, and included choice of law and forum selection clauses. Reasonable minds could not differ concerning a corporation's understanding that use of software is governed by licenses containing multiple terms.

Even construing the facts in the light most favorable to Mortenson, we find that the facts do not support the conclusion that the purchase order constitutes an integrated contract.

B. The License Terms Are an Enforceable Part of the Contract

■ ■ "Transactions in which the exchange of money precedes the communication of detailed terms are common." *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996). In *ProCD*, the Seventh Circuit held that shrink-wrap licenses accompanying off-the-shelf computer software are enforceable unless their terms are objectionable under general contract law. *See* 86 F.3d at 1449. The defendant purchased *ProCD* software at a retail outlet and made the database information therein available on the World Wide Web at a cost less than what *ProCD* charged consumers. *See id.* at 1450. The district court refused to enforce the license agreement that came with the software because the purchaser did not agree to "hidden terms"—those inside the box—even though a printed notice on the outside of the box referred to the license terms inside. *See id.* The Seventh Circuit reversed. *See id.* at 1449. The court stated: "Notice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable (a right that the license expressly extends), may be a means of doing business valuable to buyers and sellers alike." *Id.* at 1451 (citing 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 4.26 (1990) and RESTATEMENT (SECOND) OF CONTRACTS § 211 cmt. a (1981)). The court discussed several examples of "money now, terms later" transactions. *See id.* at 1451 (the purchase of insurance, airline tickets, electronic goods containing warranties inside the box, and drugs with inserts describing interactions and contraindications). Turning to the software industry, the court noted that software is often ordered over the phone and the Internet and that increasingly the delivery is also over the Internet. *See id.* at 1451-52. The court rejected the defendant's theory that would make these sales "unfettered by

terms—so the seller has made a broad warranty and must pay consequential damages for any shortfalls in performance, two 'promises' that if taken seriously would drive prices through the ceiling or return transactions to the horse-and-buggy age." *Id.* at 1452.

The Seventh Circuit again upheld license terms in a pay-now-terms-later transaction with an accept-or-return provision in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1150 (7th Cir.), *cert. denied*, 522 U.S. 803, 118 S. Ct. 47, 139 L. Ed. 2d 13 (1997). In *Hill*, the customer ordered a computer over the phone, paying with a credit card, and received the computer in the mail accompanied by a list of terms to govern if the customer did not return the computer within 30 days. *See id.* at 1148. The court posed this question: "Are these terms effective as the parties' contract, or is the contract term-free because the order-taker did not read any terms over the phone and elicit the customer's assent?" *Id.* Relying in part on *ProCD*, the court held that the terms were effective, stating: "Practical considerations support allowing vendors to enclose the full legal terms with their products." *Id.* at 1149.

*ProCD* and *Hill* allow a vendor to propose that a sale contract be formed not when the product is requested or the money is paid but after the customer has inspected the item and the terms. *See Hill*, 105 F.3d at 1150. We find the Seventh Circuit's reasoning persuasive and see similarities between these cases and the present appeal. Timberline's license agreement, included with the software, is fairly standard and contains an accept-or-return provision. Mortenson argues that the negotiations between it and Timberline distinguishes this case from *ProCD* and *Hill*,[4] cases involving off-the-shelf purchases where no negotiations took place between the buyer and seller. But although

---

[4]Mortenson argues another distinction between the present case and the *ProCD* and *Hill* cases: it asserts that the instant situation presents a § 2-207 question and that these cases did not. *See, e.g., ProCD*, 86 F.3d at 1452 (the court recognized that it was not confronted with a § 2-207 battle-of-the-forms case because there was only one form—the license). We address Mortenson's § 2-207 analysis in the next section.

the software provided by Timberline is specialized to a specific market, no evidence suggests that the software was customized for Mortenson, and we find that it is analogous to an off-the-shelf package.

Mortenson makes much of the fact that Reich never mentioned the license agreement or any of its terms during the negotiations. But the negotiations between the parties involved only the number of copies and the price. Reich's failure to bring up the license terms during price-quantity discussions is hardly surprising. Reich knew that Mortenson had a license to a prior version of the software and that it licensed other software. Consider negotiation of a law firm's Westlaw license—a Westlaw representative may negotiate an hourly rate versus a flat rate and the cost of training and customer support, but is unlikely to bring up a choice of law provision or limitations of remedies clause if those terms are not negotiable. Does failure in such a case to elicit the customer's express assent to the license terms before a purchase order is issued make a contract "unfettered by terms—so the seller has made a broad warranty and must pay consequential damages for any short-falls in performance?" *ProCD*, 86 F.3d at 1452. We conclude that it does not and hold that the terms of the present license agreement are part of the contract as formed between the parties. We find that Mortenson's installation and use of the software manifested its assent to the terms of the license and that it is bound by all terms of that license that are not found to be illegal or unconscionable.

C. A § 2-207 Analysis

Mortenson presents a § 2-207 analysis, arguing that the license agreement terms were a request by Timberline for additional terms. It asserts that acceptance of additional terms requires either express assent or conduct manifesting assent. Mortenson contends that genuine issues of material fact exist as to whether its conduct constituted acceptance of the license terms.

RCW 62A.2-207 provides:

(1) A definite and seasonable expression of acceptance or a

written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title.

In its § 2-207 analysis, Mortenson relies on *Step-Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir. 1991). On numerous occasions, Step-Saver, a value added retailer, placed telephone orders for copies of a software package produced by The Software Link (TSL) and followed with a purchase order detailing quantity, price, and shipping and payment terms. *See id.* at 95-96. TSL shipped the order with an invoice that essentially mirrored the purchase order. *See id.* at 96. A license agreement that disclaimed express and implied warranties and limited remedies was printed on the packaging of each copy of the software. *See id.* at 96. After numerous unresolved problems with the package, Step-Saver sued TSL for breach of warranties. *See id.* at 94.

The court considered whether the license terms should be incorporated into the parties' agreement under § 2-207.

*See id.* at 100. After determining, with the help of UCC default rules, that the contract was sufficiently definite without the terms in the license, *see id.* at 100, the court found that the license did not constitute a conditional acceptance under § 2-207(1) because "TSL did not clearly express its unwillingness to proceed with the transactions unless its additional terms were incorporated into the parties's [sic] agreement." *Id.* at 103. The court based this conclusion on the fact that Step-Saver twice refused to sign agreements that formalized the relationship between TSL and Step-Saver where the proposed agreements contained warranty disclaimers and limitations of remedies similar to those in the license. *See id.* at 102-03. Even though Step-Saver refused to sign the agreements, TSL continued to sell copies of the software to Step-Saver. *See id.* at 103. Additionally, the TSL license agreement was written with end users in mind and prohibited transfer of the license. *See id.* at 103. Step-Saver was not an end user, and both parties agreed that Step-Saver was entitled to transfer copies of the TSL program. *See id.* at 103. Thus, Step-Saver was willing to proceed with transactions despite conceding that not all the terms of the license agreement were applicable. *See id.* at 103. Finding that the license "should have been treated as a written confirmation containing additional terms," the court held that the warranty disclaimer and limitation of remedies terms were not part of the parties' agreement because they would have materially altered it. *Id.* at 105-06. *See also Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 766 (D. Ariz. 1993) (following *Step-Saver* in a factually similar case).

Although Mortenson argues that the facts of this case are almost identical to the facts of *Step-Saver*, the cases are distinguishable.[5] Mortenson did not twice refuse to sign an agreement that contained limiting terms. Timberline did not give any indication that some terms of the license

[5]Although Mortenson does not raise the distinction, this case is distinguishable from part of the *Step-Saver* analysis because Mortenson is not a merchant (it does not deal in software); thus, an analysis of this case does not proceed to the question of whether the terms would be a material alteration.

agreement did not apply to Mortenson or that the terms were negotiable. Instead, Mortenson requested that the program be installed and proceeded to use the software. We conclude that even if the license is viewed as a request for additional terms, Mortenson's conduct constitutes assent to those additional terms.

D. The Limitations of Remedies Clause Is Enforceable

■■ Whether a limitation on consequential damages is unconscionable is a question of law. *See American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990). The burden of establishing unconscionability is on the party challenging the limitation. *See id.* at 222.

1. Summary Judgment Is Appropriate Where No Threshold Showing of Unconscionability Is Made

■ In *Nelson v. McGoldrick*, 127 Wn.2d 124, 132-33, 896 P.2d 1258 (1995), the Washington Supreme Court addressed whether summary judgment is appropriate where unconscionability is claimed. The Court noted that some courts have prohibited summary judgment where unconscionability is a question but others have concluded that under the UCC unconscionability may be decided on summary judgment. *See id.* at 132.

The Court also noted that a number of courts have concluded that under the UCC "the determination of unconscionability is a question properly before the court on a motion for summary judgment, with a factual hearing mandatory only where the court accepts the possibility of unconscionability. Conversely, if there is no basis for such a possibility, no hearing is required." *Id.* at 133. This position was adopted in *Jeffery v. Weintraub*, 32 Wn. App. 536, 542-43, 648 P.2d 914 (1982), which stated:

> If the material facts are undisputed, and when looked at in the light most favorable to the party alleging unconscionability are insufficient to establish unconscionability, there is no need for the trial court to inquire further. Absent a threshold showing of unconscionability sufficient to survive summary judgment, the issue disappears from the case.

Although not addressing a UCC case, the *Jeffery* court held that "a hearing on a motion for summary judgment gives the parties the 'reasonable opportunity to present evidence' contemplated under RCW 62A.2-302(2)." *Id.* at 542 n.5. We adopt this position for the present case: unconscionability may be determined on summary judgment if there is no possibility, or no threshold showing, of unconscionability. We can now turn to an examination of whether the limitations clause is procedurally or substantively unconscionable.

> 2. The Limitations of Remedies Clause Is Not Unconscionable

▇▇▇▇▇▇ In *Nelson*, the Washington Supreme Court reiterated the law regarding unconscionability:

> Two classifications of unconscionability have generally been recognized: (1) substantive unconscionability, involving those cases where a clause or term in the contract is alleged to be one-sided or overly harsh; and (2) procedural unconscionability, relating to impropriety during the process of forming a contract. . . .
>
> Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh. "Shocking to the conscience", "monstrously harsh", and "exceedingly calloused" are terms sometimes used to define substantive unconscionability. Procedural unconscionability has been described as the lack of a meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print. It is important, however, that these three factors not be applied mechanically without regard to whether in truth a meaningful choice existed.

127 Wn.2d at 131 (internal quotation marks and citations omitted). "The party defending the clause may prove the clause is conscionable regardless of the surrounding circumstances if the general commercial setting indicates a

prior course of dealing or reasonable usage of trade as to the exclusionary clause." *American Nursery Prods.*, 115 Wn.2d at 223.

Considering all the circumstances surrounding the transaction in this case, the limitations clause is not procedurally unconscionable. Although Mortenson and Timberline did not specifically negotiate the limitations of remedies clause, this one factor is not conclusive. The introductory screen warned that use of the program was subject to a license. This warning placed Mortenson on notice that use of the software was governed by a license. Mortenson had reasonable opportunity to learn and understand the terms of the agreement. The limitations provision was not hidden in a maze of fine print but appeared in all capital letters. Finally, such limitations provisions are widely used in the computer software industry.

Mortenson argues that the fact that Timberline knew about the bug before it sold the software to Mortenson and did not inform Mortenson of the defect or send a new version to Mortenson contributes to the unconscionability of the license terms. However, the evidence regarding Timberline's knowledge of the bug indicates that it considered it to be an "obscure" bug, "not a major problem." CP at 224. There is no evidence showing that Timberline was aware that the bug would lead to an inaccurate bid. Considering the totality of the circumstances, we conclude that the limitations of remedies provision is not procedurally unconscionable.

Turning to substantive unconscionability, RCW 62A.2-719(3) provides in part that "[l]imitation of . . . consequential damages is valid unless it is established that the limitation is unconscionable." Limitations on consequential damages in commercial transactions are prima facie conscionable. *See American Nursery Prods.*, 115 Wn.2d at 222. Such clauses are standard in the software industry and do not shock the conscience. Indeed, they are useful in making software affordable. If software developers were prohibited from limiting consequential damages, the significant costs to the industry would be passed on to the

consumer. We conclude that the limitations of remedies provision is not substantively unconscionable. Thus, the limitations of remedies clause bars Mortenson's claim for consequential damages, and we affirm the trial court's order granting summary judgment.

## II. Denial Of The Motions To Vacate and Amend

Mortenson sought to vacate the judgment and amend the pleadings after the trial court granted Timberline's motion for summary judgment. Mortenson sought to vacate only the dismissal of the case so that it could amend its complaint to add claims for fraud and misrepresentation. It states that its fraud and misrepresentation claims were based on the fact that on August 26, 1996, Mortenson discovered that Timberline was aware of the bug in May 1993, before Mortenson purchased the program.

CR 60(b) states, in part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order; . . .
> >
> > (11) Any other reason justifying relief from the operation of the judgment.

Vacation of a judgment under CR 60(b) is within the trial court's discretion and will be overturned only for an abuse of that discretion. *See State v. Santos*, 104 Wn.2d 142, 145, 702 P.2d 1179, 70 A.L.R.4TH 1021 (1985); *Lane v. Brown & Haley*, 81 Wn. App. 102, 105, 912 P.2d 1040 (1996). "Discretion is abused when it is exercised on untenable grounds or for untenable reasons." *Id.* at 105.

Under CR 15(a), Mortenson must obtain leave of the court to amend its complaint and leave "shall be freely given when justice so requires." A trial court's decision to deny leave to amend a complaint after the pleadings have

closed is reviewed for abuse of discretion. *See Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 142, 937 P.2d 154 (1997), *cert. denied*, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 755 (1998). "A trial court may consider whether the new claim is futile or untimely." *Id.* at 142.

 "Generally, the incompetence or neglect of a party's own attorney is not sufficient grounds for relief from a judgment in a civil action." *Lane*, 81 Wn. App. at 107. Mortenson discovered what it claims is the basis for fraud and misrepresentation claims on August 26, 1996, but summary judgment was not granted until August 15, 1997. Mortenson had ample time to amend its complaint before a judgment on the merits issued. The following explanation was given to the trial court for this delay:

> In reviewing the case for appeal, Mortenson's counsel realized that the evidence that Mortenson presented in opposition to the motion for summary judgment would support a tort claim against defendants which would not be precluded by the contractual limitations set forth in Timberline's shrink wrap license. However, Mortenson's counsel did not focus on this fact at the time of the summary judgment motion because they were concerned with the more immediate contractual issues raised by defendants' motion.

CP at 342. This is not excusable neglect nor does it justify relief under subsection eleven. *See Lane*, 81 Wn. App. at 104, 107 (an attorney's failure to contact witnesses, failure to advise clients of a motion for summary judgment, utilization of an incorrect legal theory at summary judgment, and late filing of a notice of appeal did not warrant vacation of the judgment; use of CR 60(b)(11) is confined to extraordinary circumstances not covered by any other section of the rule). We find that the trial court did not abuse its discretion in denying the motions to vacate and amend which were filed almost five months after the judge granted Timberline's motion for summary judgment and dismissed the case.

We affirm the trial court's orders granting summary judg-

ment in favor of Timberline and denying Mortenson's motions to vacate the judgment and amend the pleadings.

BAKER and ELLINGTON, JJ., concur.

Review granted at 138 Wn.2d 1001 (1999).